371 So.2d 154 (1979)
CITY OF BOCA RATON, Appellant,
v.
BOCA VILLAS CORPORATION, a Florida Corporation, and Samuel Fletcher, Trustee, and Keating-Meredith Properties, Inc., Appellees.
No. 76-2322.
District Court of Appeal of Florida, Fourth District.
April 18, 1979.
Rehearing Denied May 25, 1979.
Gerald F. Richman and Bertha Claire Lee of Frates, Floyd, Pearson, Stewart, Richman & Greer, Miami, for appellant.
No appearance for appellees.
Stephen W. Metz, Tallahassee, for amicus curiae-Florida Home Builders Ass'n.
Duane Searles, Washington, D.C., for amicus curiae-National Ass'n of Home Builders.
*155 Ronald A. Zumbrun, Thomas E. Hookano and Donald M. Pach, Sacramento, Cal., and William L. Earl of Peebles, Earl & Blank, Miami, for amicus curiae-Pacific Legal Foundation.
H.M. Madsen, of Mershon, Sawyer Johnston, Dunwody & Cole, Miami, for intervenor-Arvida.
PER CURIAM.
The City of Boca Raton amended its charter by the initiative and referendum method to establish a maximum number of dwelling units allowable within the city. This zoning device is commonly referred to as placing a "cap" on density, and the parties here refer to this amendment as the "cap". This charter amendment was implemented by ordinances reducing the density in single and multi-family residential zoning classifications.
The charter amendment passed by the city electorate provided:
"The total number of dwelling units within the existing boundaries of the City is hereby limited to forty thousand (40,000). No building permit shall be issued for the construction of a dwelling unit within the City which would permit the total number of dwelling units within the City to exceed forty thousand (40,000)."
After passage of this charter amendment the City Council approved a City Planning & Zoning Board recommendation for an across-the-board density reduction of 50% for all multi-family zoning categories. Single family zoning categories were reduced to conform to the average of what had been constructed in the city prior to the charter amendment. Both the charter amendment and the implementing multi-family zoning ordinances were attacked in this suit by two property owners. After some twenty-seven days of trial the court entered an exhaustive final judgment holding that the charter amendment violated due process provisions of the State and Federal Constitutions because the cap did not bear a rational relationship to a permissible municipal objective and that the ordinances in question violated both due process and equal protection of the law. The judgment also held the current zoning of the property in question was confiscatory and directed the properties be rezoned no more restrictive than the judgment designated.
The trial judge held that the City had the power to establish a "cap" or maximum number of dwelling units allowable within the city boundaries. However, he opined that, as with any other zoning restriction, the "cap" must bear a rational relationship to a permissible municipal purpose, i.e., it must promote the public health, morals, safety or welfare. As one would imagine in a case of this nature, numerous experts were called by each side and in many respects they disagreed. It is apparent from the final judgment that the judge was not impressed by the testimony of some of the experts called to support the City's position that the "cap" and implementing ordinances were necessary to effectuate a valid municipal purpose. The judgment points to the testimony of the city Planning Director, city Engineering Director and engineering and planning consultants who contended that the City's present and future planning was quite adequate for a number of years without the cap. For example, Walter Young, the City Director of Planning, described Boca Raton's planning for the future "second to none," and that characterization is generally supported by the other expert planning witnesses. Yet in the formulation of the "cap" the city planning department was never consulted. The bottom line of Mr. Young's testimony was that, other than "community choice", he knew of no compelling reason for imposing a permanent fixed limitation on population or dwelling units. There are numerous other critical references to the quality of the city's proof to support its position, and the judgment contains specific findings of fact regarding "after-the-fact studies of the cap's relationship to public welfare" which support the conclusion reached in the judgment.
Based upon the testimony covering some 21 volumes, the trial judge made, among others, the following findings of fact bearing *156 upon the contention that the cap lacks any rational relationship to a permissible municipal objective:
"1. Boca Raton's utility systems and services are presently adequate, were adequate prior to the Cap, and there are no present indications of undue strain as a result of further anticipated growth within densities allowed prior to the Cap.
"2. Boca Raton's school facilities are presently overcrowded but the adequacy or inadequacy of those facilities is beyond jurisdictional control of the City and therefore unrelated to purported limited growth benefits of a Cap. The court has already spoken to this issue in holding unconstitutional a Boca Raton ordinance requiring developers of unplatted subdivisions to obtain a letter of intent covering new school construction from the Palm Beach County, Florida School Board. Talmon v. City of Boca Raton, No. 75 4286 CA (L) 01 F (Fla. 15th Cir.Ct. 1976). Further because of Boca Raton's population distribution, the Cap is most likely counterproductive to the entire Palm Beach County public school system. Fiscal studies of both parties confirm Boca Raton now generates a surplus of revenue for schools over and above the cost of school expenditures (including cost of new school construction).
"3. Cost-Revenue Studies by both parties establish greater fiscal surplus will result to general and capital funds of the City without the Cap.
"4. Boca Roton's water resources can abundantly withstand anticipated growth so long as proper management policies now in effect are maintained. One of the City's major factual justifications for the Cap was rooted in the `water crop' theory, which purports to limit population by a budget of rainwater falling within City limits. The theory may be useful regionally as a factor in water management decision making. However, its argued use as support for the Cap requires the court completely disregard regional water resources until the city is assured other responsible governmental agencies (U.S. Corps of Engineers, Central and Southern Flood Control District and Lake Worth Drainage District) will continue to protect the municipal interest. Neither the court nor the City can be assured, but there is no creditable evidence these authorities will fail to carry out the responsibilities delegated to them. It is not rational to completely disregard past efforts, future plans and abundant alternative water resources available to Boca Raton through these regional water-management bodies. The record establishes Boca Raton's water resources can and will ultimately be managed regionally. Water resources will not depend upon a `budget' which Boca Raton or other cities may impose, but rather will depend upon hard social choices involving agricultural priorities, environmental demands, quantity of water used in various sectors, and the cost which society is willing to pay. These are unresolved issues which directly relate to Southeastern Florida water demands and resources. A Cap predicated upon preservation of water resources is a preliminary and unnecessarily drastic solution to an area-water resource issue.
"5. Boca Raton's air quality and noise levels are normal for a community of its size and are well within state and federal standards and regulations. Anticipated growth will not cause those standards and regulations to be exceeded. The Gerrish Study of air pollution and the Peterson Study of background noise lend no credibility to the Cap or the Ashley-Veri report. Other than the water crop theory and these urban *157 environmental studies, the Ashley-Veri report does not completely support the Cap. In fact, the report's final conclusion suggests as much when recommending (a) the Cap be raised and (b) that public funds be devoted to acquisition of vacant lands to reduce units.
"6. The City's current comprehensive plan and zoning maps were essentially prepared prior to and outside the Cap. There is no showing those plans would be jeopardized or materially affected if the Cap were removed.
"7. Much of the defendant's case hinged on expert opinion to the effect the Cap represents an important community goal. The case was largely presented in abstract and without specific factual showing of real necessity. Defendant argues unpersuasively that `necessity is not the test for a city's right to amend its comprehensive plan'. Burritt v. Harris [Fla. 1965, 172 So.2d 820], supra, Davis v. Sails [Fla.App. 1975, 318 So.2d 214], supra. The Cap may well be a firm planning goal embodied in legislation. However, legislation as far reaching as this Cap should not be adopted by trial and error. The court is unpersuaded the City's intended review by Ordinance No. 1966 adds present credence to the Cap. If the Cap is now irrational, a legislated promise to later amend, modify or repeal it adds nothing to present validity."
As we mentioned above the trial judge found the charter amendment (the Cap) and the implementing zoning ordinances did not bear a rational relationship to a valid municipal purpose and that the ordinances were confiscatory as applied to appellees' property. Our study of the briefs and record convinces us that there is substantial competent evidence to support the finding of an absence of a rational relationship regarding the charter amendment and zoning ordinance. That being the case, we need not reach the question of confiscation vel non because the finding that there is no compelling need justifying an exercise of the police power burdening private property is sufficient to warrant striking down the legislative act. As the Supreme Court of Florida said in Burritt v. Harris, 172 So.2d 820 (Fla. 1965),
"The constitutional right of the owner of property to make legitimate use of his lands may not be curtailed by unreasonable restrictions under the guise of police power. The owner will not be required to sacrifice his rights absent a substantial need for restrictions in the interest of public health, morals, safety or welfare. If the zoning restriction exceeds the bounds of necessity for the public welfare, as, in our opinion, do the restrictions controverted here, they must be stricken as an unconstitutional invasion of property rights." 172 So.2d at 823 (Emphasis added.)
That is not to say there must be an absolute necessity requiring the enactment of certain zoning restrictions before they can be tolerated as a proper exercise of the police power. But, as here, an excessive restriction on the use of private property which does not contribute substantially to the public health, morals, safety and welfare is arbitrary and unreasonable and thus unconstitutional. Davis v. Sails, 318 So.2d 214 (Fla. 1st DCA 1975). The trial court found, and the record supports such finding, that the charter amendment and implementing ordinances bore no such rational relationship to the requisite purposes.
We would concede that most of the cases where judicial invalidation of zoning laws has been upheld have in some measure involved the issue of confiscation. Those cases hold that as applied to the property involved the zoning ordinance was unreasonable because it deprived a property owner of the beneficial use of his property. We suggest the reason that the confiscation issue is so pervasive in the case law on this subject is because someone's ox is getting gored. Who is going to institute litigation but the person who feels his property rights infringed upon by excessive restrictions upon the use thereof?
*158 There are cases, however, which support the principle that zoning which unnecessarily restricts property, zoning which bears no rational relationship to the public health, safety, morals and welfare is unconstitutional without raising the confiscation issue. In State v. DuBose, 99 Fla. 812, 128 So. 4 (1930), the County owned property within the City of Vero Beach and applied for a permit to construct a jail thereon. The permit was denied because the zoning ordinance applicable to this property did not authorize construction of a jail on said property and thus the County sought a Writ of Mandamus. The City contended the reason for prohibiting construction of a jail on said property was that it would increase taxes, increase traffic near a school, and it would diminish the value of school property nearby. Mandamus was denied by the trial court, but on appeal the Supreme Court found there was no support for the City's reasons for denying the County's proposed use of the property. Without a sound rational basis upon which to bottom the refusal, the court found the ordinance to be arbitrary and unreasonable as applied to this property. In a nutshell, there just was not any public need to prevent construction of the jail on the particular property. The court made the point that:
"The right of an owner to devote his land to any legitimate use is property within the terms of the Constitution, and the Legislature may not under the guise of the police power impose unnecessary or unreasonable restrictions upon such use... .
"This court is committed to the doctrine that courts should not set aside the determination of public officers relative to municipal zoning ordinances, unless it is clear that their action has no foundation in reason and is a mere arbitrary exercise of power without reference to public health, morals, safety, or welfare." 128 So. at 7.
As far as one can tell from the opinion, no claim of confiscation was made. The property owner simply maintained the absence of any reasonable relationship to a permissible municipal purpose was sufficient to invalidate the law as it applied to the complainant's property.
In City of Sherman v. Simms, 143 Tex. 115, 183 S.W.2d 415 (1944), the City passed a comprehensive zoning ordinance which, among other things, excluded churches from dwelling and apartment districts. That provision was attacked by a church group which wanted to use a structure in a residential district for public worship. Their contention was that prohibiting the use of property in a residential zone for church purpose was arbitrary, discriminatory and violative of the Federal and State Constitutions, because the restriction had no real or tangible relation to the public health, safety, morals or general welfare. After examining various zoning authorities, the court adopted a quotation from another cited case to the effect that:
"`* * * And we further conclude that the administrative act of respondents in refusing a permit to erect a church in the residential district, there being no adequate showing that this exclusion of the church was in furtherance of the public health, safety, morals or the public welfare, was arbitrary and unreasonable and in violation of relator's rights under the State and Federal Constitutions.'" 183 S.W.2d at 416.
The court went on to state:
"With this conclusion all the available authorities seem to agree. It must not be overlooked that the power to establish zones is a police power and its exercise cannot be extended beyond the accomplishment of purposes rightly within the scope of that power. To exclude churches from residential districts does not promote the health, the safety, the morals or the general welfare of the community, ..." Id. at 416-417.
Once again, the thrust of the attack upon the law was the absence of a reasonable relation to a legitimate municipal purpose; that absence being best demonstrated by the lack of any necessity for such restrictive provision.
*159 In view of our conclusion that an otherwise valid attack may be made upon the charter amendment and implementing ordinances, we need not consider the trial judge's findings that the cap and implementing ordinances are so drastic and restrictive as to be confiscatory as applied to appellees' property.
We have not overlooked the rule that municipal legislative action is presumed to be constitutional. But, of course, the presumption is rebuttable and substantial competent evidence was adduced to prove invalidity of the legislative acts. The Supreme Court of Michigan, in Smith v. Building Inspector For the Township of Plymouth, 346 Mich. 57, 77 N.W.2d 332 (1956), cited with approval the following:
"Presumption of the existence of such relationship [the relationship between exercise of police power and the public health, safety, etc.], and hence of the validity of the ordinance is resorted to in the absence of proof on the subject, but not when there are proofs on which a judicial determination thereof may be made as when the contrary is shown by competent evidence or appears on the face of the enactment. Roman Catholic Archbishop of Detroit v. Village of Orchard Lake, supra [333 Mich. 389, 53 N.W.2d 308] and cases cited therein." 77 N.W.2d at 335.
The appellant also contends that the fairly debatable rule controls this case, but we disagree. In view of our decision to affirm the trial court's holding that the charter amendment and implementing ordinances bear no rational relationship to a valid municipal purpose, we do not reach the issue of confiscation. Thus, we have not found it necessary to consider the application of the various ordinances to specific parcels of property which would possibly bring the fairly debatable rule into play. The fairly debatable rule is a rule of procedure or application which can be simply stated as follows:
"If the application of a zoning classification to a specific parcel of property is reasonably subject to disagreement, that is, if its application is fairly debatable, then the application of the ordinance by the zoning authority should not be disturbed by the courts... . The fairly debatable rule applies to the application of the ordinance and does not modify the requirement that the ordinance itself and the application thereof must have a reasonable relationship to the health, safety, morals or general welfare." Davis v. Sails, 318 So.2d 214, at 217.
However, if it had become appropriate for us to consider the propriety of the trial court's action in the light of the fairly debatable rule, we would affirm the judgment because, as we mentioned earlier, even though there was expert testimony adduced in support of the City's case, that in and of itself does not mean the issue is fairly debatable.[1] If it did, every zoning case would be fairly debatable and the City would prevail simply by submitting an expert who testified favorably to the City's position. Of course that is not the case. The trial judge still must determine the weight and credibility factors to be attributed to the experts. Here the final judgment shows that the judge did not assign much weight or credibility to the City's witnesses.
In conclusion, we have carefully considered all of the City's contentions which have been well presented; however we fail to find an adequate demonstration of reversible error. In fact, "the able and patient trial judge" (as appellant characterizes him) did a commendable job in resolving the issues presented by this vast record. Accordingly, the final judgment under review is affirmed.
AFFIRMED.
DOWNEY, C.J., ANSTEAD, J., and SILVERTOOTH, LYNN N., Associate Judge, concur.
NOTES
[1] Huttig v. City of Richmond Heights, 372 S.W.2d 833 (Mo. 1963); Franz v. Village of Morton Grove, 28 Ill.2d 246, 190 N.E.2d 790 (1963); City of Tulsa v. Swanson, 366 P.2d 629 (Okl. 1961); LaSalle National Bank of Chicago v. County of Cook, 12 Ill.2d 40, 145 N.E.2d 65 (1957).