SUSTAINABLE GROWTH INITIATIVE COMMITTEE, a Political Action Committee, Appellant, *v.* JUMPERS, LLC, a Nevada Limited Liability Company; CENTURY 21, CLARK PROPERTIES, INC., a Nevada Corporation; JAY D. MARRIAGE, an Individual; CHICHESTER ESTATES; NEVADA NORTHWEST, LLC; DOUGLAS COUNTY, a Political Subdivision of the State of Nevada; DOUGLAS COUNTY BUILDING INDUSTRY ASSOCIATION, a Nevada Nonprofit Corporation; AURORA LAND, LLC, a Nevada Limited Liability Company; MERRILL CONSTRUCTION, INC., a Nevada Corporation; and SYNCON HOMES, Respondents.

SYNCON HOMES, Cross-Appellant, *v.* SUSTAINABLE GROWTH INITIATIVE COMMITTEE, a Political Action Committee, Cross-Respondent.

DOUGLAS COUNTY BUILDING INDUSTRY ASSOCIATION, a Nevada Nonprofit Corporation; AURORA LAND, LLC, a Nevada Limited Liability Company; and MERRILL CONSTRUCTION, INC., a Nevada Corporation, Cross-Appellants, *v.* SUSTAINABLE GROWTH INITIATIVE COMMITTEE, a Political Action Committee; and DOUGLAS COUNTY, a Political Subdivision of the State of Nevada, Cross-Respondents.

No. 41118

February 9, 2006                    128 P.3d 452

[Rehearing denied May 15, 2006]

*Brooke Shaw Zumpft* and *William Jac Shaw*, Minden, for Appellant/Cross-Respondent Sustainable Growth Initiative Committee.

*Bader & Ryan* and *Kevin P. Ryan*, Reno, for Respondents Jumpers, Century 21, and Marriage.

*Scott W. Doyle*, District Attorney, and *Brian V. Chally*, Chief Deputy District Attorney, Douglas County; *Thorndal Armstrong Delk Balkenbush & Eisinger* and *Brent T. Kolvet*, Reno, for Respondent Douglas County.

*Scarpello & Huss, Ltd.*, and *Mark R. Forsberg*, Carson City, for Respondents Chichester Estates and Nevada Northwest.

*Kelly R. Chase*, Minden, for Respondents/Cross-Appellants Douglas County Building Industry Association, Aurora Land, and Merrill Construction.

*Law Offices of Kermitt L. Waters* and *James Jack Leavitt, Autumn L. Waters*, and *Kermitt L. Waters*, Las Vegas; *Manatt, Phelps & Phillips, LLP*, and *Michael Munroe Berger* and *George M. Soneff*, Los Angeles, California, for Respondent/Cross-Appellant Syncon Homes.

*McDonald Carano Wilson LLP* and *John Frankovich*, Reno, for Amicus Curiae Nevada Association of Realtors.

## OPINION

By the Court, Rose, C. J.:

In this appeal, we address a challenge to a growth initiative adopted by the voters in Douglas County, Nevada. In 2002, the

voters of Douglas County passed the Sustainable Growth Initiative (SGI), which limited the number of new dwelling units in the county to 280 per annum. The SGI was challenged as being inconsistent with the Douglas County Master Plan (Master Plan), and the parties filed competing motions for summary judgment. The district court found that the SGI conflicted with the Master Plan and held the SGI void ab initio. The Sustainable Growth Initiative Committee (the SGIC) appeals that decision, arguing that the SGI is in substantial compliance with the Master Plan and should not be defeated on summary judgment. We agree with the SGIC and hold that the SGI is not so inconsistent as to require us to strike down the will of the people by holding it invalid. Thus, we reverse the decision of the district court.

## FACTS

The SGIC was formed for the purpose of qualifying an initiative to limit residential growth in the Carson Valley and the Antelope Valley drainage basins on a sustainable, managed basis. The SGI was submitted and approved for the November 2002 ballot. The SGI read:

> Shall Douglas County adopt an ordinance amending its development code to provide that no more than 280 new dwelling units shall be built annually in Douglas County, exclusive of the area regulated by the Tahoe Regional Planning Agency (TRPA), except in a disaster emergency declared by the Board of County Commissioners?

The SGI passed with a total vote of 53.22 percent.[2] Several parties (collectively Jumpers) immediately thereafter filed an action seeking injunctive and declaratory relief. The SGIC was permitted to intervene in the action, and following a hearing, the district court granted Jumpers' application for a temporary restraining order.

In addition to Jumpers, several other plaintiffs filed actions against Douglas County seeking to enjoin enactment of the initiative. The parties stipulated to consolidate the actions. The parties also stipulated that the issues of the SGI's consistency with the

---

[2]Before the vote on the SGI, we heard a challenge attempting to keep the initiative off the ballot. *Garvin v. Dist. Ct.*, 118 Nev. 749, 59 P.3d 1180 (2002). In *Garvin*, we stayed the district court order enjoining the SGI from being placed on the ballot after we concluded that the SGI was legislative and not administrative, which allowed the SGI to proceed to voting. *Id.* at 765, 59 P.3d at 1191. While we considered the matter, the SGI appeared on the ballot and passed, and therefore, *Garvin* did not address whether the SGI was substantively valid. *See id.* at 766, 59 P.3d at 1191.

Douglas County Master Plan, the facial validity of the SGI, and whether the SGI could be implemented without violating Nevada Constitution Article 19[3] or NRS Chapter 295[4] would be bifurcated from the other issues and would be heard first on summary judgment.[5]

The district court heard the summary judgment motions in February 2003 and found that the SGI was inconsistent with the Douglas County Master Plan. It granted summary judgment in favor of Jumpers and Douglas County and denied the SGIC's summary judgment motion. The district court stated, ''Although [the] SGI is consistent with the Master Plan's goal of establishing a growth cap, it is completely inconsistent with the Plan's methodology for doing so, and frustrates other facets of the Plan's vision for orderly growth and development.'' The district court described several areas of inconsistency, including the Master Plan's recommended growth rate of 2 to 3 1/2 percent per year, the Master Plan's policies concerning conservation and development of natural resources, adoption of a capital improvement plan and hydrology studies to ensure growth does not exceed the county's infrastructure, the Master Plan's requirement that there be a method for maintaining affordable housing, the Master Plan's policies concerning transfer of development rights (TDR), and how the SGI will impact present contracts.

The district court also ruled that, taking the SGIC's assertions as true, the SGI was facially valid for the purposes of summary judgment. It stated:

> SGIC has established the requisite nexus (although it is tenuous) between a rationally conceived building cap and a reasonably anticipated water shortage based upon at least debatable scientific prognostication. It has also demonstrated the diminishment of a rural quality of life. Therefore, [the SGI] is not facially invalid as it survives a constitutional challenge at this stage of the proceedings.

The district court also issued an advisory opinion that the SGI could not be implemented without violating Article 19 of the Nevada Constitution or NRS Chapter 295. It concluded that because of the brevity of the SGI, it was ''inevitable that any lan-

---

[3]Nevada Constitution Article 19, Section 2(3) prohibits amending an initiative within three years of its effective date.

[4]NRS 295.180(1) prohibits an initiative from being ''repealed, overruled, annulled, set aside or in any way made inoperative, except by a direct vote of the registered voters of that county.''

[5]The other challenges to the SGI were issues regarding damages, due process, per se takings of private property without compensation, and violations of the Federal Civil Rights Act, 42 U.S.C. § 1983 (2000).

guage adopted by the County through ordinance would necessarily entail amending it."[6] The court then certified its summary judgment order as final pursuant to NRCP 54(b).

The SGIC moved for clarification of whether the SGI was constitutionally valid, whether it was rationally related to a substantial or legitimate interest, and whether the SGIC's motion for summary judgment on this issue was granted or if all parties' motions on this issue were denied. The district court reiterated in its order on the SGIC's motion for clarification that:

> SGIC survived summary judgment on the constitutionality of the initiative because the court could not rule on the validity of the underlying facts. Viewing those facts in a light most favorable to [the SGIC], the court could not definitively say that its designation of a 280-building-permit limit was arbitrary, capricious and not rationally related to its espoused goals. This finding, however, as intimated by the court, could change at trial.

The district court concluded that its determination that the SGI was inconsistent with the master plan entitled Jumpers to a permanent injunction of the SGI. Essentially, the district court declared the issue of constitutionality moot because the question of consistency precluded any necessity for evaluating the constitutionality issue. The district court denied SGIC's motion for clarification and reaffirmed its original order.

The SGIC appealed all three issues—compliance with the Master Plan, constitutionality, and the need to amend the SGI. Douglas County objected to the appeal of the constitutionality and amendment of the initiative issues because they were not part of the original summary judgment order that dealt solely with the compliance issue. Syncon Homes (Syncon) cross-appealed all three issues, which Douglas County again objected to on the same basis. Douglas County Building Industry Association (DCBIA) cross-appealed the district court's denial of summary judgment to all parties on the SGI's facial validity and the district court's decision to reserve that issue for trial. Douglas County objected to the DCBIA's cross-appeal because the facial validity issue was not the basis on which the district court predicated summary judgment in favor of Jumpers and Douglas County.

Douglas County asked this court to dismiss this appeal. We required the parties to show cause by correcting the jurisdictional defects in the appeal and ensuring that the district court summary judgment order could be certified as final under NRCP 54(b). The district court entered an amended order incorporating by reference

---

[6]The district court did not otherwise reach the issue of whether the SGI violated Nevada statutory or constitutional law because it determined that the SGI was void ab initio.

the summary judgment and clarification orders. It also stated, "Given the plethora of disputed facts relied upon by the various parties in supporting or attacking the scientific data upon which [the SGI] was predicated, this court was constrained to deny [Jumpers'], [Douglas County's] and [the SGIC's] motions [for summary judgment]" on the constitutionality issue. In conclusion, the district court declared the constitutionality and amendment issues moot and reaffirmed its basis for granting Jumpers' and Douglas County's motions for summary judgment. Following the district court's amended order, we denied Douglas County's motion to dismiss the appeal and allowed the appeal to proceed.

## DISCUSSION

At the outset, we note that it is important that we are reviewing this appeal in the context of summary judgment and not a trial verdict. As such, our decision today is shaped by the summary judgment standard, which differs from trial review standards.

We review an appeal from an order granting a motion for summary judgment de novo.[7] "Summary judgment is appropriate under NRCP 56 when the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that are properly before the court demonstrate that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law."[8] Although evidence presented in support of a motion for summary judgment must be construed in the light most favorable to the nonmoving party, that party must set forth facts demonstrating the existence of a genuine issue in order to withstand a disfavorable summary judgment.[9] A factual dispute is genuine when the evidence is such that a rational jury could return a verdict in the nonmoving party's favor.[10] Here, respondents have the burden of demonstrating that there are no genuine issues of material fact that the SGI does not substantially comply with the Master Plan. We will construe all evidence in the light most favorable to the SGIC.

The appeals and cross-appeals before us today address three main issues—whether the SGI substantially complies with the Master Plan, whether the SGI is facially constitutional, and whether the SGI will require an amendment within three years of its enactment in order to implement, apply, or adopt the SGI. We have carefully considered all of the parties' arguments and conclude that only the arguments hereinafter addressed merit discussion.

[7]*Bulbman, Inc. v. Nevada Bell*, 108 Nev. 105, 110, 825 P.2d 588, 591 (1992).

[8]*Wood v. Safeway*, 121 Nev. ___, ___, 121 P.3d 1026, 1031 (2005).

[9]*Id.*

[10]*Id.*

*The SGI's compliance with the Douglas County Master Plan*

The district court granted summary judgment in favor of respondents, finding that the SGI did not substantially comply with the Master Plan. The SGIC appeals that determination, arguing first that the SGI is a new legislative policy and, therefore, is not required to substantially comply with the Master Plan. Alternatively, the SGIC argues that the district court erred by finding that the SGI does not substantially comply with the Master Plan. We disagree that the SGI is a new legislative policy, which is not required to substantially comply with the Master Plan. We agree, however, that the district court erred by finding that the SGI did not substantially comply with the Master Plan as a matter of law.

### *The SGI is required to substantially comply with the Master Plan*

All counties with populations of 40,000 or more people must create a planning commission.[11] The planning commission is responsible for creating and adopting a comprehensive, long-term master plan for the county's physical development.[12] The purpose of a master plan is to provide ''[a] pattern and guide for that kind of orderly physical growth and development of the . . . county which will cause the least amount of natural resource impairment and will conform to the adopted population plan, where required, and ensure an adequate supply of housing, including affordable housing.''[13] The Douglas County Master Plan was approved and adopted by the Board of Commissioners (the Board) in 1996.

A county's governing body can create zoning districts in order to ''regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land.''[14] Adopted zoning regulations must be in accordance with the master plan.[15] When adopting zoning regulations, the governing body must give reasonable consideration ''to the character of the area and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the city, county or region.''[16]

The SGIC acknowledges that zoning ordinances and variances must be in substantial compliance with the Master Plan. It argues,

---

[11]NRS 278.030(1).

[12]NRS 278.150(1)-(2).

[13]NRS 278.230(1)(a).

[14]NRS 278.250(1).

[15]NRS 278.250(2).

[16]NRS 278.250(3).

however, that the SGI is a new legislative policy, not a zoning ordinance, and, as such, is not required to substantially comply with the Master Plan.[17] The SGIC cites *Garvin v. District Court*[18] as conclusive authority that the SGI is a new legislative policy that is not subject to substantial compliance requirements. In *Garvin*, we stated that the SGI is "policy-driven, and is legislative in character. Executing this new policy will be an administrative matter."[19]

The SGIC's reliance on *Garvin* in support for its argument is misplaced. As pointed out by Syncon, the question of the SGI's precise status in regard to substantial compliance was not the issue before us in *Garvin*. In *Garvin*, we merely addressed whether the SGI was legislative or administrative in nature, thereby either allowing a vote or precluding it from appearing on the ballot.[20] Thus, *Garvin* is not wholly controlling.

The Nevada Constitution reserves the power of initiative to voters of a county as to all "local, special and municipal legislation of every kind in or for such county."[21] The voters' initiative power is not without limits, however, and, indeed, the voters have only those legislative powers that the local governing body possesses.[22]

*Black's Law Dictionary* defines "policy" as "general principles by which a government is guided in its management of public affairs, or the legislature in its measures."[23] By classifying the SGI as a "policy," it would have no practical effect other than to be treated as a guideline. At the county level, legislation is adopted as ordinances. To have legal effect and achieve the desired 280-unit per annum limit, the SGI must be enacted as a zoning ordinance under the Douglas County development code. Further, the SGI states, "Shall Douglas County adopt an ordinance *amending its development code* to provide that no more than 280 new dwelling units shall be built annually in Douglas County?" (Emphasis added.) In the SGI ballot explanation, a similar statement is made that the initiative proposes to amend the development code.[24] As a

[17]The SGIC also argues that NRS 278.250 requires only that site-specific zoning substantially comply with a master plan. However, the plain language of NRS 278.250 is not limited to site-specific zoning.

[18]118 Nev. 749, 59 P.3d 1180 (2002).

[19]*Id.* at 766, 59 P.3d at 1191.

[20]*Id.*

[21]Nev. Const. art. 19, § 4.

[22]*Horne v. City of Mesquite*, 120 Nev. 700, 705, 100 P.3d 168, 171 (2004).

[23]*Black's Law Dictionary* 1041 (5th ed. 1979).

[24]We have previously examined ballot information when interpreting an initiative. *Governor v. Nevada State Legislature*, 119 Nev. 460, 467 & n.10, 76 P.3d 22, 27 & n.10 (2003).

zoning ordinance, the SGI must substantially comply with the Master Plan. Thus, the SGIC's argument that the SGI is a new policy and, therefore, not subject to substantial compliance fails.

*The SGI is not substantially noncompliant as a matter of law*

"[A] presumption of validity attaches to local zoning enactments and amendments."[25] Additionally, the master plan of a community is a " 'standard that commands deference and a presumption of applicability,' " but it is not a legislative mandate from which no leave can be taken.[26] Thus, although the SGI is entitled to a presumption of validity, the Master Plan is also entitled to deference.[27]

In *Lesher Communications v. Walnut Creek*, the California Supreme Court announced what is known as the "consistency requirement."[28] It said,

> A zoning ordinance that conflicts with a general plan is invalid at the time it is passed. The court does not invalidate the ordinance. It does no more than determine the existence of the conflict. It is the preemptive effect of the controlling state statute, the Planning and Zoning Law, which invalidates the ordinance.[29]

Thus, the California Supreme Court held that zoning ordinances that conflict with the master plan are void ab initio.[30] In *Nova Horizon v. City Council, Reno*,[31] we expressed a similar "consistency requirement," noting that under NRS 278.250(2) " 'zoning regulations shall be adopted in accordance with the master plan for land use.' "[32] We further stated that "[t]his suggests that municipal entities must adopt zoning regulations that are in substantial agreement with the master plan."[33] We have since reiterated this requirement,[34] but have also explained that a zoning ordinance need not be

---

[25]*County of Clark v. Doumani*, 114 Nev. 46, 53, 952 P.2d 13, 17 (1998).

[26]*Id.* at 53-54, 952 P.2d at 17 (quoting *Enterprise Citizens v. Clark Co. Comm'rs*, 112 Nev. 649, 659, 918 P.2d 305, 311 (1996)).

[27]*See id.* at 54, 952 P.2d at 17.

[28]802 P.2d 317, 324-25 (Cal. 1990).

[29]*Id.* (citations omitted).

[30]*Id.*

[31]105 Nev. 92, 96, 769 P.2d 721, 723 (1989).

[32]*Id.* (quoting NRS 278.250(2)).

[33]*Id.*

[34]*Serpa v. County of Washoe*, 111 Nev. 1081, 1084, 901 P.2d 690, 692 (1995).

in perfect conformity with every master plan policy.[35] The relevant inquiry is not whether there is a direct conflict between a master plan's provision and an ordinance, but whether the ordinance "is compatible with, and does not frustrate, the [master] plan's goals and policies."[36]

In the present case, the SGIC notes that the relevant Master Plan goals are: to enhance Douglas County citizens' way of life, to ensure equal access and opportunities to all Douglas County citizens, to adopt future growth management tools to direct future growth and land use, to protect and enhance every aspect of Douglas County's natural resources, to protect the County's agricultural resources, and to ensure orderly development and limit the potential of natural hazards.

A portion of the introduction to the Master Plan reflects these goals:

> A number of common and consistent themes were evident from the public discussion. First, many residents feel strongly that Douglas County is an excellent place to live, work, and raise their children. They feel strongly that protection of this high quality of life and the particular features which make this County so attractive should be a high priority. The theme "keep our rural character" was heard many times and in many different ways from residents.
>
> Most residents acknowledge and support continued growth, but believe that growth should be managed or directed and should occur at a pace that doesn't overwhelm or negatively impact the current attributes of the County. Most residents also indicated that the County should live within its means, both fiscally and environmentally, and not grow beyond the limits imposed by financial ability or natural resources. Finally, most residents agree that new development should pay its own way and should not be a burden on existing residents.

The SGIC appropriately notes that the argument in favor of the SGI included in the sample ballot echoes these themes by stating, "a large number of citizens of Douglas County are concerned

---

[35]*Nova Horizon v. City Council, Reno*, 105 Nev. 92, 96, 769 P.2d 721, 723 (1989) ("Other jurisdictions have construed their statutes as requiring strict conformity between master plans and zoning ordinances, even to the point of requiring changes in zoning after a modification in a master plan. While such a strict view of the invariable application of a master plan on zoning matters may lend a high degree of predictability to prospective land uses . . . , we do not perceive the legislative intent to be so confining and inflexible. We therefore choose to view a master plan as a standard that commands deference and a presumption of applicability, rather than a legislative straightjacket from which no leave may be taken." (citations omitted)); *see also Napa Citizens v. Napa County Bd. of Sup'rs*, 110 Cal. Rptr. 2d 579, 605 (Ct. App. 2001).

[36]*Napa Citizens*, 110 Cal. Rptr. 2d at 605-06.

about excessive residential growth and want to slow it down before the quality of life, property taxes, and natural resources, particularly water, are negatively impacted." The SGI clearly mirrors the policies and concerns of the Master Plan. Thus, the SGI is substantially compliant with Master Plan policies and goals. The district court, however, found that the SGI was inconsistent and incompatible with certain Master Plan goals.[37] Although we hold that the SGI is not inconsistent with the Master Plan as a matter of law, we conclude that five purported inconsistencies merit our discussion— the building cap, conservation of natural resources, public facilities and fiscal responsibility, affordable housing, and transferable development rights and development agreements.

### Building cap

The SGIC argues that the SGI is substantially consistent with the Master Plan because the Master Plan anticipated a residential building limit. We previously stated that "[t]he Douglas County Master Plan anticipated a future limitation on growth, but it did not establish one. The initiative's proponents evidently decided that the time was ripe, and chose to change the Master Plan by establishing a general building cap on residential units to regulate growth."[38]

Under NRS 278.160(1)(g), a master plan must establish "[a]n estimate of the total population which the natural resources of the city, county or region will support on a continuing basis without unreasonable impairment."[39] The jurisdiction's related zoning ordinances must also protect the natural resources from unreasonable impairment and conform to the adopted population plan.[40]

The Master Plan's growth management goal, Goal 9.03, states, "To accommodate new development at a pace which can be adequately served by available community facilities and services." The Master Plan also provides that "[i]n order to protect both the County's financial and natural resources, the County should adopt a building permit allocation system covering residential uses."[41] As such, under the Master Plan, "[a] growth rate between 2 and

---

[37]Syncon argued that the SGIC occasionally cited in its briefs, in contravention of appellate rules, to its assertions made below. We have carefully limited our consideration today to the proper facts in the record.

[38]*Garvin v. Dist. Ct.*, 118 Nev. 749, 765-66, 59 P.3d 1180, 1191 (2002).

[39]A master plan must also be coordinated with the master plans of adjoining regions. NRS 278.170(1).

[40]NRS 278.250(2)(b), (e). Paragraph (e) was redesignated in 2005 as paragraph (g) as the result of amendments to the statute. 2005 Nev. Stat., ch. 404, § 19, at 1592.

[41]Douglas County, Nev., Code § 9.007.

3.5 percent annually is suggested to attain'' the goal of managing growth while not negatively impacting the community.[42]

The 280-unit per annum cap reflects approximately a 2 percent increase in population from the 2000 census population figures. Respondents argue that this percentage will necessarily decrease each year as the 280 units are added to Douglas County's population base. Although this is true, the 2 percent increase is nonetheless consistent with the Master Plan. The residents of Douglas County voted specifically to control growth at the lowest level recommended by the Master Plan. We cannot say that the mere fact that the level of growth may fall below 2 percent in the future renders the SGI substantially noncompliant as a matter of law.

As respondent points out, the Master Plan states that the County's building permit allocation should be tied to both a capital improvements planning program and hydrological studies in order to protect the County's financial and natural resources. Although not tied to hydrological studies or a capital improvements planning program, the 280-unit per annum cap is tied to the Master Plan's recommended population growth. Because the SGI is tied to population growth, it is not inconsistent with the Master Plan even though not tied to hydrological studies or a capital improvements plan. There is no assurance that the SGI will continue in perpetuity, and after the three-year limitation on amending an initiative,[43] the voters can amend or repeal the initiative. Thus, the SGI's 280-unit per annum cap is not inconsistent with the Master Plan.

*Conservation, development, and utilization of natural resources*

NRS 278.160(1)(b) requires a master plan to create a conservation plan for the development and utilization of natural resources, including water. The jurisdiction's related zoning ordinances also must protect the natural resources from unreasonable impairment.[44] The Master Plan included a plan for estimated water demand through 2015. It concludes that the current underground water resources are sufficient until the population approaches 47,000 people. Thereafter, the annual recharge of the underground water supply would be insufficient to meet continuing needs, and it would be necessary to use surface water to recharge the groundwater basin and/or store the surface water to meet the population demands.

Simply because the water studies demonstrate that the water supply is adequate for 47,000 people does not require the citizens of

---

[42]*Id.* § 2.004.

[43]Nev. Const. art. 19, § 2(3).

[44]NRS 278.020(2)(a); NRS 278.250(2)(b).

Douglas County to allow expeditious growth until that population number is reached. In fact, the SGI's growth cap serves to conserve water, in accordance with the Master Plan. And there is nothing in the SGI that prevents the Board from otherwise creating a conservation plan for the development and utilization of natural resources.

*Public facilities and fiscal responsibility*

The Master Plan identifies several goals and policies establishing the County's commitment to maintaining existing levels of service within fiscal means and ensuring that growth will not take place beyond the county's financial capabilities. Douglas County argues that this makes the County's tying of a building permit allocation system to the County's capital improvement plan legally supportable. Douglas County argues that none of the capital improvement plan reports indicate that planned projects are negatively impacting the County's fiscal health. The Nevada Association of Realtors (NVAR) argues that the 280-unit cap ignores economic and public service plan considerations and circumvents Master Plan policy critical to the public welfare. The NVAR also notes a conflict with promoting future economic stability.

At issue are two general obligation bonds held by Douglas County for water and sewer projects that are secured by pledged revenues from connection fees. These fees are directly related to the number of new residences built. The bonds were issued based on sewer and water rate studies of a 3.5 percent annual growth rate. Therefore, NVAR asserts that the SGI's 280-unit cap will cause a revenue shortfall that will have to be satisfied through the general fund or increased utility rates.

Although Douglas County's fiscal health is of the utmost importance, the SGI is not so substantially noncompliant with the Master Plan as to require this court to strike it down for that reason. The Master Plan projected growth at 2 to 3.5 percent, and the SGI limits growth to 2 percent. Douglas County secured its bonds based on a 3.5 percent annual growth rate, without any indication that the actual growth rate that would be implemented in Douglas County would be 3.5 percent. That fact does not render the SGI inconsistent. There is no evidence that the 280-unit per annum cap will result in growth beyond Douglas County's fiscal capabilities, and thus, it is not inconsistent with the Master Plan.

*Affordable housing*

NRS 278.160(1)(e)(8) requires that a master plan contain a housing plan that includes a provision for the development and

maintenance of affordable housing.[45] The Master Plan notes that growth control programs can cause escalation of housing prices and that empirical studies on that issue have shown mixed results. The primary Master Plan step to promote the housing goals is the set-aside provision for the building permit allocation program. Master Plan Policies 8.02.01 and 8.02.04 promote affordable housing projects and order development code revisions incorporating incentives for the development of housing to aid seniors and the disabled. Douglas County incorporated the policies into its code.[46] Douglas County argues that the SGI overrides these provisions and enactments by creating an inflexible 280-unit cap that makes no provision to support affordable housing. Nevada Northwest agrees and argues that because the cap reduces by half the average number of permits Douglas County issues and the cap ties itself to new units rather than permits, the SGI does not ensure that there is an adequate supply of affordable housing. We do not agree.

As noted by the SGIC, if the SGI had been drafted to specify the number of building permits allocated for affordable housing versus other competing housing needs, we would have likely held it to be administrative in nature and thus an invalid initiative. Also, there is no evidence that the 280-unit cap will create an affordable housing problem, and nothing prevents Douglas County from allocating a certain number of the 280 units to affordable housing. Any cap on housing, whether it be 280 or 560 results in fewer homes, whether they be affordable or otherwise. The SGI does not preclude Douglas County from implementing its incentive program to encourage developers to provide affordable housing. Respondents have failed to meet their burden of demonstrating that the initiative does not substantially comply with the Master Plan in regard to affordable housing.

### Transferable development rights/development agreements

The SGIC argues that the district court erred by finding that the SGI violated Nevada Constitution Article 1, Section 15, which proscribes that any law impairing a contract obligation is invalid. The contracts at issue are transferable development rights[47] (TDR) and development agreements, which are permissible under the

---

[45]*See also* NRS 278.250(2)(j). Paragraph (j) was redesignated in 2005 as paragraph (l) as the result of amendments to the statute. 2005 Nev. Stat., ch. 404, § 19, at 1592.

[46]Douglas County, Nev., Code § 20.440.

[47]TDR is a concept that allows a private landowner to "sever his development rights in an area where development is objectionable and transfer them to an area where development is less objectionable." Andrew J. Miller, *Transferable Development Rights in the Constitutional Landscape: Has Penn Central Failed to Weather the Storm?*, 39 Nat. Resources J. 459, 465 (1999).

Douglas County Development Code.[48] The SGIC asserts that NRS 278.0201(3) clearly establishes that subsequent changes in the law do not apply to preexisting development agreements. NRS 278.0201(3) states:

> This section does not prohibit the governing body from adopting new ordinances, resolutions or regulations applicable to that land which do not conflict with those ordinances, resolutions and regulations in effect at the time the agreement is made, except that any subsequent action by the governing body must not prevent the development of the land as set forth in the agreement. The governing body is not prohibited from denying or conditionally approving any other plan for development pursuant to any ordinance, resolution or regulation in effect at the time of that denial or approval.

By its plain language, NRS 278.0201(3) does not prohibit the SGI. And there is nothing to indicate that had the Board implemented a permit cap, TDRs and development agreements would have been better protected or not affected. There is also nothing to indicate that a higher building permit cap would remedy any TDR or development agreement issues that may arise. Further, the purpose of the TDR is to protect the rural lifestyle, which the SGI arguably accomplishes by limiting development. Respondents have failed to meet their burden of proving that the TDR program and development agreements are so affected by the SGI as to render it substantially noncompliant with the entire Master Plan as a matter of law.[49]

Although we acknowledge that there are inconsistencies between the SGI and certain provisions of the Master Plan, after comparing the SGI to the Master Plan as a whole, we cannot say that as a matter of law the SGI is noncompliant to an extent that would require us to usurp the will of the people. Ultimately, the district court might strike down the SGI at trial after finding that these inconsistencies render the SGI substantially noncompliant. However, we cannot hold that, at this stage in the proceedings and with the evidence before us, respondents have met their summary judgment burden to demonstrate inconsistency as a matter of law.

## Constitutional challenges

The district court found that the SGI was facially constitutional solely for the purpose of the summary judgment proceeding. The district court, however, denied all of the parties' motions for sum-

---

[48]Douglas County, Nev., Code §§ 20.500.10, 20.500.20.

[49]Douglas County also argues that the SGI acts as a moratorium on building. A "moratorium" is defined as "[t]he suspension of a specific activity." *Black's Law Dictionary* 1031 (8th ed. 2004). The SGI does not suspend building, and thus, we find this argument untenable.

mary judgment. The SGIC argues that because the district court found that the SGI was facially valid for purposes of summary judgment, the district court erred by denying its summary judgment motion.[50] Respondents argue that the SGI acts as a taking and, therefore, the district court erred by not applying mid-level scrutiny when determining facial validity. The parties also urge us to exercise our sua sponte power to reach constitutional issues and determine whether the SGI is constitutional.[51]

First, denial of a motion for summary judgment is not appealable.[52] Thus, we cannot address whether the district court properly denied all parties' motions for summary judgment. Second, the issues of whether the SGI acts as a taking and violates due process were bifurcated from the issues before us and were reserved for a later date. We therefore decline to address these issues sua sponte. We will address only whether the district court properly determined that the SGI is facially valid for summary judgment purposes.[53] As such, it is unnecessary for us to discuss constitutional doctrine in any great length or depth.

We first note that a zoning ordinance has a presumption of validity.[54] Thus, respondents bear the burden of proving that the SGI is constitutionally unsound.[55] Second, a zoning ordinance is unconstitutional only if its "provisions are clearly arbitrary and unrea-

---

[50]The SGIC's assertion that the district court should have granted it summary judgment on this issue misrepresents the district court's holding. The district court expressed that the facts were in dispute and that the evidence presented by the SGIC was tenuous. Thus, it determined that the SGI was facially valid solely for the purposes of summary judgment as its determination of this issue affected its ability to reach the substantial compliance issue.

[51]*Boulder City v. Cinnamon Hills Assocs.*, 110 Nev. 238, 245, 871 P.2d 320, 324 (1994).

[52]*Taylor Constr. Co. v. Hilton Hotels*, 100 Nev. 207, 209, 678 P.2d 1152, 1153 (1984) (denial of summary judgment is not final and not amenable to NRCP Rule 54(b) certification).

[53]The district court later amended its order and found the constitutional issue moot. Therefore, we invoke our sua sponte authority to address constitutional issues only to the extent that we address the district court's original finding that the SGI was facially valid for the purposes of summary judgment.

[54]*State v. District Court*, 101 Nev. 658, 660, 708 P.2d 1022, 1023-24 (1985); *List v. Whisler*, 99 Nev. 133, 137-38, 660 P.2d 104, 106 (1983). The presumption of validity applies equally to ordinances and to statutes. *See Starlets International v. Christensen*, 106 Nev. 732, 735-36, 801 P.2d 1343, 1344-45 (1990) (determining that an ordinance banning prostitution was presumed to be constitutional absent a clear showing that the ordinance was not reasonable and rationally related to a legitimate state interest).

[55]*State v. District Court*, 101 Nev. at 660, 708 P.2d at 1023-24.

sonable, having no substantial relation to the public health, safety, morals, or general welfare.''[56] This is a limited standard of review.

Here, the SGIC arrived at the 280-unit per annum cap by determining a 2 percent growth rate of Douglas County's population based on the 2000-01 Census. According to Census figures, Douglas County contained approximately 35,000 people, 2 percent of whom is 700. The SGIC then divided 700 by 2.59, the average number of people in each household according to the Master Plan, and rounded up to 280. Thus, we conclude that the SGIC did not arbitrarily and capriciously arrive at the 280-unit figure. Further, as we stated above, the 280-unit cap comports with the Master Plan and reflects Douglas County residents' desire to protect and conserve their natural resources. ''[E]very line drawn by a legislature leaves some out that might well have been included.''[57] We cannot say that just because the 280-unit per annum cap leaves some out that might have been included, the 280-unit figure is arbitrary and capricious.

Regarding the substantial relationship to health, safety, morals, or general welfare, taking the SGIC's assertions as true for purposes of summary judgment, the district court correctly found that the SGIC presented evidence that the 280-unit cap would protect water resources. Limiting houses to 280 units per year would certainly seem to provide greater protection of water resources than some larger per year number. And protecting water resources is a legitimate state interest. Additionally, the SGIC asserts that the cap protects the rural character of Douglas County. As stated by the United States Supreme Court, ''[t]he police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people.''[58] Protection of a community's character is substantially re-

---

[56]*Euclid v. Ambler Co.*, 272 U.S. 365, 395 (1926); *see also Construction Ind. Ass'n, Sonoma Co. v. City of Petaluma*, 522 F.2d 897, 906 (9th Cir. 1975) (upholding the constitutionality of a zoning or land use ordinance if it bears a rational relationship to a legitimate state interest); *Kuban v. McGimsey*, 96 Nev. 105, 112, 605 P.2d 623, 627 (1980) (determining that where a regulation promotes the health, safety, welfare, or morals of a community, it is constitutionally valid).

[57]*Village of Belle Terre v. Boraas*, 416 U.S. 1, 8 (1974); *accord City of Petaluma*, 522 F.2d at 908 (stating that ''[a]lthough we assume that some persons desirous of living in Petaluma will be excluded under the housing permit limitation and that, thus, the Plan may frustrate some legitimate regional housing needs, the Plan is not arbitrary or unreasonable'').

[58]*Village of Belle Terre*, 416 U.S. at 9; *see also Ybarra v. City of Town of Los Altos Hills*, 503 F.2d 250 (9th Cir. 1974) (upholding a zoning ordinance

lated to legitimate state interests.[59] We conclude that based on the above, the district court did not err by finding the SGI facially valid for purposes of summary judgment because it was not arbitrary and capricious and was substantially related to protecting "public health, safety, morals, [and the] general welfare."[60]

*Amendment of the initiative*

Amendment of an initiative is prohibited within the first three years of its passage.[61] Additionally, NRS 295.180(1) states:

> When a majority of the registered voters of the county voting upon the question submitted, by their vote, approve the act or resolution, it is the law of the State, and may not be repealed, overruled, annulled, set aside or in any way made inoperative, except by a direct vote of the registered voters of that county.

The district court found that, given the brevity of the SGI, any adoption by the County through ordinance would entail amending the SGI. It noted that it might be appropriate to allocate the 280-unit permits between various types of housing, *i.e.*, affordable, single-family, and timeshares. Primarily, the court found that the conflict with the Master Plan would create the greatest need to amend the SGI after implementation. We disagree.

It must first be noted that the district court, in its amended order, determined that this issue was moot because it held the SGI void ab initio. In the interest of judicial economy, we exercise our power to address constitutional issues sua sponte to resolve this issue.[62] There is nothing on the face of the SGI that precludes the Board from allocating the 280-unit permits between various types of housing or offering incentives to developers to create affordable housing. Such an allocation would not require amending the SGI. We have also concluded that as a matter of law, the SGI is not in-

---

providing that no lot could be smaller than one acre and no lot could be occupied by more than one primary dwelling unit because the ordinance was rationally related to the preservation of the town's rural environment).

[59]*City of Petaluma*, 522 F.2d at 908-09 (stating that "the concept of the public welfare is sufficiently broad to uphold Petaluma's desire to preserve its small town character, its open spaces and low density of population, and to grow at an orderly and deliberate pace").

[60]*Euclid*, 272 U.S. at 395.

[61]Nev. Const. art. 19, § 2(3).

[62]*Boulder City v. Cinnamon Hills Assocs.*, 110 Nev. 238, 245, 871 P.2d 320, 324 (1994).

consistent with the Master Plan and, therefore, the district court's finding that inconsistencies with the Master Plan would require amendment of the SGI within three years is error.

## CONCLUSION

Douglas County residents were concerned with maintaining, conserving, preserving and protecting their way of life and, as such, the majority of Douglas County residents voted to keep the rural character of their community. We conclude that, based upon the evidence before the district court, the SGI is substantially compliant with the Master Plan to survive summary judgment and, as such, we will not upset the will of the people by holding the SGI invalid.

Accordingly, we reverse the district court's orders granting summary judgment and remand for further proceedings.

DOUGLAS, J., and SHEARING, SR. J., concur.

PARRAGUIRRE, J., with whom BECKER, J., agrees, dissenting:

Initially, I emphasize the importance of the initiative process and acknowledge the Douglas County electorate's laudable efforts in using the democratic process to preserve the current state of their community. However, I cannot join the majority's decision.

The Douglas County Master Plan, more than 400 pages long, was adopted in 1996 for one reason: to provide Douglas County with a comprehensive plan for future development and management of growth for the next twenty years. I recognize that limiting growth is an important concern of Douglas County residents; however, I fear the SGI's enactment will render inoperable many of the Plan's objectives and policies. As a result, I would affirm the district court order concluding the initiative is inconsistent with the Plan and thus void ab initio.

The majority concludes the SGI is consistent with the Plan because it attempts to slow growth, which is clearly a concern to county residents. In reaching this conclusion, however, the majority disregards that limiting growth is but one facet of a plan that was intended to be a comprehensive tool for growth development. After considering the Plan as a whole, I believe the SGI's implementation will lead to many unintended consequences that are incompatible with numerous Plan objectives and policies.

First, the SGI directly conflicts with the Plan's recommended growth rate. As the majority noted, the Plan recommends an annual growth rate ranging from 2 to 3.5 percent. In contrast, the SGI's 280-unit cap represented only a 2 percent growth rate for 2000. Although this growth rate was within the Plan's recommended lower range, this rate will drop below 2 percent in subsequent years because the cap is rigid. As time goes on, the

SGI-imposed rate will fall further below the Plan's recommended growth rate. Consequently, the SGI's limit on growth—trumpeted by the majority as the primary reason for the SGI's consistency with the Plan—actually highlights its glaring inconsistency.

Second, not only is the SGI's growth rate inconsistent with the Plan, the SGI frustrates the Plan's requirement that the County maintain and develop an adequate supply of affordable housing. The supply of affordable housing will decrease under the SGI because capping annual building permits at 280 will drastically decrease the number of available housing permits.[1] Fundamental economic principles dictate that low housing supply—when coupled with the high housing demand in Douglas County—will increase prices.[2] By reducing the supply and affordability of housing, the SGI harms both County residents wishing to move from temporary to permanent housing and residents outside the community wanting to purchase a home in the County. Because the SGI harms both present and future residents by hindering the County's ability to maintain and develop an adequate supply of affordable housing, it conflicts with the Plan.

Third, in addition to frustrating the County's ability to develop and maintain affordable housing, the SGI is inconsistent with the Plan's requirement that housing for senior citizens and the disabled remain available. The Plan mandates that a certain percentage of building permits be set aside for senior and disabled housing. The SGI, however, makes no mention of how the 280 building permits will be allocated or whether senior citizens and the disabled will have access to that housing. Given the likely increase in housing prices and decrease in available developed parcels, the SGI may force senior and disabled populations to shoulder an inordinate burden.

Fourth, beyond overburdening seniors and the disabled, the SGI frustrates the Plan's Transfer of Development Rights (TDR) program.[3] The TDR program preserves open space by allowing the County to restrict development in scenic and agricultural areas while simultaneously providing for development in more suitable densely populated areas. For example, the TDR program requires a developer seeking to develop a parcel to secure an interest in a second, equally large parcel zoned for agricultural, forest, or range

---

[1] For example, respondents assert that the average number of building permits issued annually by Douglas County since the 1996 adoption of the Plan is 523. Taking this figure as accurate, the 280-unit cap will reduce the number of available permits by almost 50 percent.

[2] The district court heard anecdotal evidence that the SGI has already caused housing prices within Douglas County to rise dramatically.

[3] The Plan encouraged adopting the TDR program; the County responded by incorporating the TDR program into the Douglas County Development Code. *See* Douglas County, Nev., Code ch. 20.500.

use. The owner of the second parcel then loses the right to ever develop that parcel.

Because developers must have the right to develop parcels for a TDR program to function properly, the SGI—by providing no assurances that a developer will be able to timely develop a parcel—risks crippling the program, which will have disastrous effects on the County and directly conflicts with the Plan. Specifically, the SGI's negative impact on the TDR program will severely undercut the Plan's goals to prevent urban sprawl and preserve the County's rural character.

Fifth, in addition to hampering the Plan's efforts to contain sprawl, the SGI also violates the Plan's procedure for enacting such a permit allocation system. The Plan mandates that, before enacting any permit allocation system, the County must adopt a Capital Improvements Plan (CIP). The County failed to adopt a CIP here. This key procedural step might have prevented some of the problems outlined above and further calls the SGI's legitimacy into question.

The SGI's potential problems are particularly troubling because an initiative cannot be amended within the first three years of its passage.[4] Thus, the SGI cannot be amended to designate how the 280 building permits will be allocated, and the County will be unable to immediately rectify any unintended negative consequences of the SGI.

Because I believe the SGI is inconsistent with the County Master Plan, I need not decide whether the SGI can survive constitutional scrutiny. Notably, case law from other jurisdictions indicates that the initiative's rigid 280-building-permit limit is of questionable constitutional validity when the cap was not based on scientific studies and contains no plan for variances or future increase.[5]

Certainly nothing prohibits the county's residents from passing an initiative directing the Douglas County Planning Commission to perform studies in an effort to enact a growth cap that is consistent

---

[4]Nev. Const. art. 19, § 2(3).

[5]*Stoney-Brook Dev. Corp. v. Town of Fremont*, 474 A.2d 561, 563-64 (N.H. 1984) (ordinance limiting annual building permits to 3 percent of total dwellings unconstitutional when percentage was an arbitrary figure intended to represent town's normal growth rate); *Beck v. Town of Raymond*, 394 A.2d 847, 852 (N.H. 1978) (town's slow-growth ordinance setting ceilings on the issuance of annual building permits invalid exercise of town's police power when "not based on any study, and . . . not part of a comprehensive plan"); *Inn. Motor Lodge v. City of New Smyrna Beach*, 460 So. 2d 379, 380 (Fla. Dist. Ct. App. 1984) (density cap arbitrary and unreasonable when it was not based on any studies and did not allow for variances in cases of unique hardship); *City of Boca Raton v. Boca Villas Corp.*, 371 So. 2d 154, 155-57 (Fla. Dist. Ct. App. 1979) (initiative capping dwelling units at 40,000 unconstitutional when only compelling reason for permanent cap was community

with all the policies and goals in the Master Plan. Although the initiative's supporters are well intended and have exercised an important political right, I believe the SGI as currently written will have far-reaching consequences beyond those contemplated at the time of its passage. As a result, I must respectfully dissent.

choice); *see also National Land and Investment Company v. Kohn*, 215 A.2d 597, 612 (Pa. 1965); *Zuckerman v. Town of Hadley*, 813 N.E.2d 843, 849 (Mass. 2004); *cf. City of Hollywood v. Hollywood, Inc.*, 432 So. 2d 1332, 1334-36 (Fla. Dist. Ct. App. 1983) (city's rezoning proposal was constitutional when proposal based on comprehensive plans, studies, and reports).