140 Nev., Advance Opinion 29

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| CITY OF LAS VEGAS, A POLITICAL SUBDIVISION OF THE STATE OF NEVADA,<br>Appellant,<br>vs.<br>180 LAND CO., LLC, A NEVADA LIMITED LIABILITY COMPANY; AND FORE STARS, LTD.,<br>Respondents. | No. 84345<br><br>FILED<br><br>APR 18 2024<br>ELIZABETH A. BROWN<br>CLERK OF SUPREME COURT<br>BY<br>CHIEF DEPUTY CLERK |
| 180 LAND CO., LLC, A NEVADA LIMITED LIABILITY COMPANY; AND FORE STARS, LTD., A NEVADA LIMITED LIABILITY COMPANY,<br>Appellants/Cross-Respondents,<br>vs.<br>CITY OF LAS VEGAS, A POLITICAL SUBDIVISION OF THE STATE OF NEVADA,<br>Respondent/Cross-Appellant. | No. 84640 |

Consolidated appeals and cross-appeal from a district court judgment and post-judgment order in an inverse condemnation action. Eighth Judicial District Court, Clark County; Timothy C. Williams, Judge.

*Affirmed.*

Leonard Law, PC, and Debbie A. Leonard, Reno; Jeffry M. Dorocak, City Attorney, and Jeffrey L. Galliher and Rebecca L. Wolfson, Deputy City Attorneys, Las Vegas; McDonald Carano LLP and George F. Ogilvie, III, Amanda C. Yen, and Christopher Molina, Las Vegas; Shute, Mihaly & Weinberger, LLP, and Andrew W. Schwartz and Lauren M. Tarpey, San Francisco, California,
for City of Las Vegas.

24-13605

Law Offices of Kermitt L. Waters and Kermitt L. Waters, James J. Leavitt, Michael A. Schneider, and Autumn L. Waters, Las Vegas; Claggett & Sykes Law Firm and Micah S. Echols, Las Vegas,
for 180 Land Co., LLC, and Fore Stars, Ltd.

Davison Van Cleve, PC, and Robert D. Sweetin, Las Vegas; Matthew Leo Cahoon, Las Vegas,
for Amicus Curiae Nevada League of Cities.

Goicoechea, Di Grazia, Coyle & Stanton, Ltd., and Nancy Porter and Lauren A. Landa, Elko,
for Amicus Curiae City of West Wendover.

Nicholas G. Vaskov, City Attorney, and Amanda Kern and Brandon P. Kemble, Assistant City Attorneys, Henderson,
for Amicus Curiae City of Henderson.

Nossaman, LLP, and Steven M. Silva, Reno; Karl Hall, City Attorney, and Jonathan Shipman, Assistant City Attorney, Reno; Micaela Moore, City Attorney, North Las Vegas,
for Amici Curiae City of Reno, City of North Las Vegas, and International Municipal Lawyer's Association.

---

BEFORE THE SUPREME COURT, EN BANC.[1]

---

[1]The Honorable Kristina Pickering, Justice, and the Honorable Patricia Lee, Justice, voluntarily recused themselves from participation in the decision of this matter. The Honorable Abbi Silver, Senior Justice, and the Honorable Egan Walker, District Judge, respectively, were appointed by the court to sit in their places. Nev. Const. art. 6, § 19; SCR 10.



## OPINION

By the Court, HERNDON, J.:

Our constitutional takings jurisprudence has long recognized that regulatory agency decisions that deprive a landowner of all economically beneficial use of their property—a per se regulatory taking—require just compensation to the landowner under both the Fifth Amendment of the United States Constitution and Article 1, § 8(3) of the Nevada Constitution. In this matter, the City of Las Vegas challenges the district court's determination that a per se regulatory taking occurred and its $48 million award to the landowner, 180 Land Co., LLC. In its separate appeal, 180 Land challenges the district court's award of prejudgment interest.

The totality of the circumstances surrounding the City's handling of 180 Land's attempts to develop the 35 acres at issue, demonstrated through 180 Land's applications to develop the property, the official actions of the city council, and statements and actions of City representatives and employees, evinces the futility of 180 Land's past and future development efforts on the property. With any efforts to develop the property rendered futile, the district court did not err in determining that a per se regulatory taking occurred. The district court also did not err in relying on 180 Land's expert's valuation of the property to determine just compensation, especially as the City neither challenged the valuation nor provided alternative valuations. Finally, both parties' challenges to other

 

aspects of the district court's damages award fail to present a basis for reversal. Accordingly, we wholly affirm the district court.[2]

## FACTS AND PROCEDURAL HISTORY

*Development of the golf course*

In 1981, the City adopted a Generalized Land Use Plan to reclassify 2,200 acres of land, called Peccole Ranch, to allow for "residential densities" that would align with the City's General Plan. In 1986, the City preliminarily approved, subject to a resolution of intent, a request to zone the proposed golf course within Peccole Ranch for residential planned-unit development, or R-PD.[3] Other conditions having been met, a revised master plan, the Peccole Ranch Master Development Plan, was fully approved in 1990, with the golf course acreage zoned as R-PD7.

The golf course was developed between 1992 and 1996. In 1992, the City adopted a new Las Vegas General Plan classifying the golf course acreage as "Parks/Schools/Recreation/Open Space" (PR-OS). However, the land was not rezoned; rather, the 1992 ordinance adopting the General Plan stated that it "shall not be deemed to modify or invalidate any . . . zoning designation." In line with that ordinance, the City confirmed to the golf course acreage's owner in a 1996 letter that the zoning remained R-PD7 for the golf course. The golf course acreage also retained the PR-OS land

---

[2]In light of this opinion, we vacate the stay ordered by this court on May 9, 2022.

[3]R-PD zoning was established in 1972 "to allow a maximum flexibility for imaginative residential design and land utilization in accordance with the General Plan" and "to promote an enhancement of residential amenities by means of an efficient consolidation and utilization of open space, separation of pedestrian and vehicular traffic and a homogeneity of use patterns."

designation in subsequent iterations of the General Plan through 2018. In 2001, the City adopted another ordinance regarding the golf course acreage that formally rezoned it to R-PD7 on the Official Zoning Map Atlas, and repealed any previous conflicting ordinances. Zoning Bill No. Z-2001, Ordinance 5353. In 2015, the operator of the golf course informed the then-landowners, Fore Stars, Ltd., that it could no longer make a profit operating the golf course and thereafter terminated its lease in 2016.

*180 Land purchases and seeks to develop the golf course acreage*

180 Land eventually came to hold all of the ownership interest in Fore Stars, which included the golf course acreage and Fore Stars' business assets, with the acquisition being finalized in or around 2016. According to a manager of 180 Land, Yohan Lowie, in 2001 he began negotiating a "handshake deal" with the former landowners of Peccole Ranch to partner with them to purchase certain properties, and in exchange, Lowie would have the right of first refusal if the golf course acreage ever went up for sale. When the Peccole Ranch landowners started to have financial and legal struggles regarding their various properties, including the golf course, Lowie was able to negotiate an agreement that, in relevant part, provided him, or entities he owned or managed, ownership of the golf course acreage at a purported cost of $30 million. The 2005 meeting minutes from the board of directors for the Peccole-Nevada Corporation show that the board adopted a resolution "to reserve . . . approximately $30 million to pay off the current loan in full with Nevada State Bank related to the purchase of the leasehold interest of the . . . Golf Course when such loan can be paid." A separate 2014 contract, however, showed a purchase price of $7.5 million for the ownership interest in Fore Stars, which included the golf course acreage.

SUPREME COURT
OF
NEVADA

(O) 1947A

5

Although the golf course acreage contained nine parcels, 180 Land segmented it into four areas for development purposes: (1) the 35-acre site at issue in these appeals, (2) a 17-acre site, (3) a 65-acre site, and (4) a 133-acre site. 180 Land first sought development by way of an application to develop the 17-acre site filed in November 2015, which the City approved in February 2017. That approval, however, was met with significant opposition from a group of homeowners. In 2020, following litigation instituted by the homeowners, the City notified 180 Land of its entitlement to move forward to develop 435 multifamily housing units on the 17-acre parcel, with such approvals remaining valid for two years.[4] This included changing the PR-OS designation to high-density residential and rezoning the site from R-PD7 to medium-density residential (R-3).

180 Land first sought to develop the 35-acre site in December 2016, filing (1) a General Plan Amendment as to the golf course acreage to change the designation from PR-OS to low-density residential, and, specifically as to the 35-acre site contained therein, (2) a site development review for 61 lots, (3) a Tentative Map Plan application, and (4) a waiver on the size of private streets. City planning staff recommended approving the applications.

In May 2017, while the foregoing applications regarding the 35 acres were still pending, 180 Land also applied for a new, comprehensive Master Development Agreement for the entire golf course acreage. City

---

[4]The district court granted the homeowners' petition for judicial review, but this court reversed the district court on appeal such that the City's approval of the development application was reinstated. *See Seventy Acres, LLC v. Binion*, No. 75481, 2020 WL 1076065 (Nev. Mar. 5, 2020) (Order of Reversal).

planning staff recommended approving the Master Development Agreement application as well. Indeed, 180 Land had collaborated on this application with the City's planning staff for more than two years, requiring numerous meetings and revisions to the proposed application.

In March 2017, the homeowner group filed its challenge to the to the City's approval of the 17-acre application. While that case was being litigated, the proposed development of the 35 acres was discussed at a contentious City Council hearing in June 2017, with strong public opposition to 180 Land's applications. The City ultimately denied the applications despite the City's planning staff having recommended approval. The City's final decision stated that the denials were "due to significant public opposition to the proposed development, concerns over the impact of the proposed development on surrounding residents, and concerns on piecemeal development of the Master Development Plan area rather than a cohesive plan for the entire area." Despite rejecting the 35-acre application, in part because of concerns over "piecemeal development," the City also rejected the comprehensive Master Development application in August 2017, two months after rejecting the 35-acre application. Also in August 2017, the City rejected applications from 180 Land pending since 2016 for three access points to the golf course acreage from neighboring public streets and to install fencing around two water features on the acreage. The City stated it denied the applications because of "the various public hearings and subsequent debates concerning the development on the subject site" and instructed 180 Land to file an application for a "Major Review" under the City's municipal code. 180 Land did not file any Major Review applications. The City also denied 180 Land's application for a

technical drainage study, though Las Vegas Municipal Code (LVMC) 19.16.105 requires such a study before residential development is allowed.

*City employees and representatives respond to 180 Land's residential development proposals*

Although the City rejected 180 Land's development proposals, its representatives had previously recognized the site's ability to be developed residentially. At a 2016 Special Planning Commission Meeting, an attorney for the City, along with a public works employee, confirmed that the area was "hard zon[ed]" R-PD7: "[T]he Council gave hard zoning to this golf course, R-PD7, which allows somebody to come in and develop." The same attorney for the City confirmed this again before the City Council in 2017 when it was considering whether to amend the master plan, stating that "[i]f you do not grant the general plan amendment tonight, you will merely leave in place a general plan that's inconsistent with the zoning, and the zoning trumps, in my opinion." A year later at another City Council meeting, the same city attorney and a member of the City's planning staff reconfirmed the R-PD7 zoning and told the City that "the [master plan] was changed after the zoning was in place." A planning director for the City testified in a 2016 deposition regarding development of the golf course acreage that "[i]f the land use and the zoning aren't in conformance, then the zoning would be a higher order entitlement." And in 2019, when responding to a discovery request, the City stated that it "does not dispute that the [35 acres] is zoned R-PD7."

Members of the City Council also commented regarding 180 Land's development proposals. While seeking election, former City Councilperson Steve Seroka stated in a news interview that the City would have the golf course acreage turned over to it in a land swap. Former Councilperson Bob Coffin also said, in a group text, that he was looking for

"intel on the scum behind the [golf course] takeover. Dirt will be handy if I need to get rough." Councilperson Coffin further directed others to use their personal emails to discuss the golf course development issue and not to use the name of the golf course to avoid the communications being subject to disclosure under a previously issued subpoena. In an email, Councilperson Coffin referred to someone from 180 Land, presumably Lowie, as a "motherfucker," "son-of-a-bitch," and "[a]sshole."

*180 Land successfully sues for inverse condemnation*

After the denial of its applications, 180 Land sued the City for inverse condemnation.[5] The district court entered numerous orders to resolve 180 Land's claims after taking evidence and holding multiple hearings. It first found that the hard zoning for the site was R-PD7 and that such zoning permitted, as a right, single-family and multiresidential development. It also granted summary judgment on all four theories of takings claims raised by 180 Land. In the just compensation portion of the proceedings, the district court ultimately adopted 180 Land's expert's valuation of the land, $34,135,000, noting that the City did not present any contrary valuations or any other rebuttal evidence and did not depose 180 Land's expert. The district court also granted 180 Land's requests for reimbursement of its property taxes, prejudgment interest, and attorney fees. In doing so, the district court rejected 180 Land's request for a 23-percent prejudgment interest rate, calculating its prejudgment interest

---

[5]180 Land also sought judicial review of the City's decisions. The district court denied judicial review but severed the inverse condemnation claims and allowed 180 Land to proceed on those claims. As no party appealed the district court's order denying judicial review, that order is not before us, and we do not address it in this opinion.

SUPREME COURT
OF
NEVADA

(O) 1947A

9

award using a prime plus 2-percent rate. The final judgment in favor of 180 Land totaled $48,114,039.30.

Both parties now appeal. The City challenges the district court's finding that a taking occurred, the just compensation award, and the other monetary awards made to 180 Land. 180 Land challenges only the amount of the prejudgment interest award.

## DISCUSSION

We first address the parties' arguments regarding the interaction between the PR-OS designation on the 35-acres and its R-PD7 zoning. We then address whether the district court properly determined that a taking occurred. Finally, we resolve the City's challenges to the just compensation award and the parties' challenges to the other damages awarded by the district court.

*Land designation and zoning*

An overarching issue in this case is whether the site's R-PD7 residential zoning or its PR-OS land designation governed 180 Land's ability to develop the property and/or conferred certain rights on 180 Land. The City argues that the district court erred in rejecting the PR-OS land designation in the Peccole Ranch Master Plan, especially because that designation predated 180 Land's purchase of the land at issue. The City acknowledges the R-PD7 zoning but asserts that zoning must comply with the general plan. Based on these assertions, and because it claims the discretion to deny any development applications, the City argues that the district court also erred in concluding that the R-PD7 zoning conferred a vested right on 180 Land to develop the land residentially. The amici briefs received by this court also argue that the PR-OS designation bars any finding that 180 Land had a right to develop the property residentially,

foreclosing any takings claims.[6] 180 Land responds that zoning is the appropriate basis to determine any rights it may have to develop the property, noting that the City confirmed the RPD-7 zoning before 180 Land came to own the property and that this creates a "vested right to use the 35 Acre Property for single-family and multi-family residential, as a matter of law."

A master or general plan is a "comprehensive, long-term general plan for the physical development of the city." NRS 278.150(1). Nevada law authorizes a city to create zoning districts wherein "it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land." NRS 278.250(1). Such zoning regulations must, among other things, "be adopted in accordance with the master plan for land use." NRS 278.250(2). When exercising zoning powers, a city "may use any controls relating to land use or principles of zoning that the governing body determines to be appropriate." NRS 278.250(4).

We have previously held that zoning enactments are "entitled to a presumption of validity" and that, while a master or general plan "is a standard that commands deference," "it is not a legislative mandate from which no leave can be taken." *Sustainable Growth Initiative Comm. v. Jumpers, LLC*, 122 Nev. 53, 64, 128 P.3d 452, 460 (2006). We have further held that "a zoning ordinance need not be in perfect conformity with every master plan policy." *Id.* at 64-65, 128 P.3d at 461. In tandem with these holdings, we have recognized that "zoning regulations shall be adopted in accordance with the master plan for land use," referring to this as a

---

[6]The cities of Reno, Henderson, North Las Vegas, and West Wendover, along with the International Municipal Lawyer's Association and Nevada League of Cities, filed amici briefs.

"consistency requirement." *Id.* at 64, 128 P.3d at 460 (quoting *Nova Horizon v. City Council, Reno*, 105 Nev. 92, 96, 769 P.2d 721, 723 (1989)).

The problem with applying the consistency requirement in this case is that substantial evidence demonstrates that the R-PD7 zoning *predated* the PR-OS land designation. Thus, the zoning had already been adopted at the time the land was designated as PR-OS in the master plan. The record shows that, as early as 1986, the City had preliminarily approved zoning the golf course acreage as residential, albeit subject to a later-satisfied resolution of intent. The PR-OS designation, on the other hand, was first imposed on the subject acreage in 1992 when the City adopted a new Las Vegas General Plan. Also detrimental to the City's argument, the ordinance adopting the PR-OS designation explicitly stated that it did not "modify or invalidate any . . . zoning designation, or development approval that occurred before the adoption of the Plan." Indeed, in line with that ordinance, the City confirmed to the golf course acreage's owner in a 1996 letter that the zoning remained R-PD7.

Ample authority supports our conclusion that the zoning ordinance trumps the designation on the master plan. NRS 278.349(3)(e) provides that when deciding whether to approve a tentative map to subdivide property, the governing body must consider whether the subdivision conforms with "zoning ordinances and [the] master plan, except . . . if any existing zoning ordinance is inconsistent with the master plan, the zoning ordinance takes precedence." *See also* Op. Att'y Gen. 84-6 (1984) (concluding that amending the land use Master Plan "does not require immediate amendment of pre-existing zoning ordinances that are not in strict compliance with the amended plan" and noting that "the Nevada Legislature expressly declared its intention [in the statute that

Supreme Court
OF
Nevada

(O) 1947A

eventually became NRS 278.349(3)(e)] that zoning ordinances take precedence over provisions contained in a master plan"); *Clark Cnty. Off. of the Coroner/Med. Exam'r v. Las Vegas Rev.-J.*, 136 Nev. 44, 57 n.5, 458 P.3d 1048, 1058 n.5 (2020) (explaining that "while Attorney General opinions are not binding legal authority, they are of persuasive legal significance").

Further, the record includes admissions by the City's attorney that he could not determine how the PR-OS designation was placed on the land and that zoning would trump any inconsistent land use designation in the master plan. Indeed, the City's own "land use hierarchy" places zoning designation at the pinnacle.[7] Although the City now claims that this means that a zoning designation is inferior to a land use designation, it stated the opposite in its briefing in the case involving the 17-acre site:

> In the hierarchy, the land use designation is subordinate to the zoning designation, for example, because land use designations indicate the intended use and development density for a particular use, while zoning designations specifically define allowable uses and contain the design and development guidelines for those intended uses.

---

[7]According to the City's "Land Use & Rural Neighborhoods Preservation Element" (adopted Sept. 2, 2009), the hierarchy "is designed to progress from broad to specific," with the master plan at the bottom, followed by the land use element, the land use designation, the master development plans/special area plans and, finally, the zoning designation at the top of the hierarchy.

Thus, we reject any assertion that the PR-OS land designation overrides the R-PD7 zoning.[8]

The City's assertions that the district court committed reversible error in finding that 180 Land had a vested right to develop the 35 acres because the City retains discretion to reject any application, even where it complies with applicable zoning, are likewise unavailing. Rather than considering if 180 Land had vested rights to development, this case requires us to determine whether the City's actions destroyed the economic value of the land such that it amounts to a taking, which could still occur under the City's discretionary authority. *See Boulder City v. Cinnamon Hills Assocs.*, 110 Nev. 238, 245-46, 871 P.2d 320, 324-25 (1994) (rejecting a takings claim where the government's use of its discretionary authority to reject "a permit to build living quarters for the elderly did not destroy all viable economic value of the prospective property").

*The takings claim*

"Whether the government has inversely condemned private property is a question of law that we review de novo." *McCarran Int'l Airport v. Sisolak*, 122 Nev. 645, 661, 137 P.3d 1110, 1121 (2006). 180 Land asserted four theories in support of its takings claim below: (1) a *Penn Central*[9] taking alleging that the City's actions destroyed nearly all the economic value of the 35 acres; (2) a per se regulatory taking alleging that

_____

[8]We further note that other documents, including governmental records, recognized the 35 acres as being residential. For instance, 180 Land's 2017-18 statement of the taxable value of its land lists the 35 acres as residential, and the Clark County Assessor's valuation stated that the parcel was zoned as R-PD7 and that its "probable use" is "residential."

[9]*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978).

the City's actions destroyed all of the site's economic value; (3) a per se regulatory physical taking alleging that the City granted the public access to the site, ousting 180 Land from the site; and (4) a nonregulatory de facto taking alleging that the City obstructed its right to residentially develop the property such that it became valueless. Because we ultimately conclude that a per se regulatory taking occurred, we need not address the three other theories.

"The Takings Clause of the Fifth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, prohibits the government from taking private property for public use without just compensation." *Sisolak*, 122 Nev. at 661-62, 137 P.3d at 1121 (footnote omitted). The Nevada Constitution similarly provides that "[p]rivate property shall not be taken for public use without just compensation having been first made, or secured." Nev. Const. art. 1, § 8(3). Courts initially viewed these provisions as protecting only against an owner's ouster from possession but later recognized "that state regulation of property may also require just compensation." *Sisolak*, 122 Nev. at 662, 137 P.3d at 1121 (citing *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). This occurs when government regulation is "so onerous that its effect is tantamount to a direct appropriation or ouster." *Id.* at 662, 137 P.3d at 1121-22. "[S]uch 'regulatory takings' may be compensable under the Fifth Amendment." *Id.* at 662, 137 P.3d at 1122 (quoting *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005)).

*Initial considerations*

*Property interest*

"An individual must have a property interest in order to support a takings claim." *Id.* at 658, 137 P.3d at 1119. Thus, when considering

inverse condemnation claims, a "court must first determine 'whether the plaintiff possesses a valid interest in the property affected by the governmental action.'" *Id.* (quoting *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000)). Stated another way, a court must ensure that "'the plaintiff possesse[s] a stick in the bundle of property rights,' before proceeding to determine whether the governmental action at issue constitute[s] a taking." *Id.* (quoting *Karuk Tribe*, 209 F.3d at 1374). Property rights include the rights to possess, use, and enjoy the property. *Id.* There is no question that 180 Land, the owner of the 35 acres, has a valid interest in the property to support a takings claim.

### The property at issue

Pertinent to our takings analysis is a determination of the property at issue. The City contends that, rather than considering the 35-acre site individually, the entire 250 acres comprising the golf course must be considered together to determine if a complete loss of economic value occurred. "'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." *Penn Cent.*, 438 U.S. at 130. Instead, we focus "both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole." *Id.* at 130-31.

Because the test for a per se regulatory taking requires "compar[ing] the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property whose value is to furnish the denominator of the fraction." *Murr v. Wisconsin*, 582 U.S. 383, 395 (2017) (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987)).

SUPREME COURT
OF
NEVADA

(O) 1947A

16

Indeed, "[t]o the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question." *Id.* (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 644 (1993)).

We recognize that "no single consideration can supply the exclusive test for determining the denominator" in a takings action. *Id.* at 397. Instead, we must attempt to "determine whether reasonable expectations about property ownership would lead a landowner to anticipate that [their] holdings would be treated as one parcel, or, instead, as separate tracts." *Id.* Factors to consider include "the treatment of the land under state and local law; the physical characteristics of the land; and the prospective value of the regulated land." *Id.* As to the first factor, the court should give substantial weight to how the state measures metes and bounds and divides the land. *Id.* at 398.

Turning to the property's physical characteristics, we must consider "the physical relationship of any distinguishable tracts, the parcel's topography, and the surrounding human and ecological environment." *Id.* The City asserts that the entirety of the golf course acreage had related topography and thus should be considered the relevant parcel for 180 Land's takings claim. But we see no such unique concerns regarding the golf course acreage, which the record demonstrates is in a suburban area surrounded by residential and commercial development, that might require treating the entirety of the golf course acreage as a single parcel. *Cf. Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 (1992) (Kennedy, J., concurring) (noting that "[c]oastal property may

SUPREME COURT
OF
NEVADA

(O) 1947A

17

present . . . unique concerns for a fragile land system") (cited with approval by *Murr*, 582 U.S. at 398).

As to the prospective value of the regulated land, "courts should assess the value of the property under the challenged [governmental action], with special attention to the effect of burdened land on the value of other holdings." *Murr*, 582 U.S. at 398; *see id.* at 398-99 (providing an example of where a restriction on one property's use may increase another property's value "by increasing privacy, expanding recreational space, or preserving surrounding beauty"). We recognize that the City's approval of development on the 17-acre parcel would likely derive value that would have to be considered in resolving 180 Land's takings claim if we considered the golf course acreage to be the denominator acreage in this case.[10]

Applying these principles here demonstrates that treating the 35 acres as the denominator parcel of land for 180 Land's takings claim is appropriate. It is a single parcel with an individual parcel number and was treated as an individual parcel throughout the entirety of 180 Land's attempts to obtain the City's approval to develop it, even when 180 Land submitted applications regarding the entire 250 acres. And that the City approved development on the 17-acre parcel, but not on the 35-acre parcel, further demonstrates the 35 acres' separate nature. While the 35 acres used to be part of the 250 acres making up a golf course, there are no ecological or other physical aspects of the land that warrant us treating the 250 acres

___

[10]To the extent 180 Land argues that the City has since acted in a manner that prohibits development on the 17-acre parcel, that issue was not before the district court, and we therefore do not consider it. *See FDIC v. Rhodes*, 130 Nev. 893, 897, 336 P.3d 961, 964 (2014) (providing that this court generally does not consider issues not raised before the district court when it rendered its decision).

as the whole parcel in this case. The approval of development on the 17 acres adding value to the entire 250 acres does not outweigh these other considerations.

*Ripeness*

We next address the City's assertion that 180 Land's takings claim was not ripe, such that the district court exceeded its jurisdiction by allowing the claim to proceed. "[A]n essential prerequisite to [the] assertion [of a regulatory takings claim] is a final and authoritative determination of the type and intensity of development legally permitted on the subject property." *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001) ("[O]nce it becomes clear that . . . the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened."); *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985) ("[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."). This is so the court can understand the "nature and extent of permitted development before adjudicating the constitutionality of the [government actions] that purport to limit it." *Sisolak*, 122 Nev. at 664, 137 P.3d at 1123 (quoting *Lucas*, 505 U.S. at 1011). Otherwise, "it is impossible to tell whether the land retain[s] any reasonable beneficial use or whether [existing] expectation interests ha[ve] been destroyed." *MacDonald*, 477 U.S. at 349 (alternations in original) (quoting *Williamson Cnty.*, 473 U.S. at 190 n.11).

Finality is normally achieved by exhausting administrative remedies, *Sisolak*, 122 Nev. at 664, 137 P.3d at 1123, but "[w]hen exhausting available administrative remedies . . . is futile, a matter is deemed ripe for review," *State ex rel. Dep't of Transp. v. Eighth Jud. Dist. Ct. (Ad Am.)*, 131 Nev. 411, 418, 351 P.3d 736, 742 (2015). Futility occurs when "the state agency charged with enforcing a challenged land-use regulation entertains an application from an owner and its denial of the application makes clear the extent of development permitted, and neither the agency nor a reviewing state court has cited noncompliance with reasonable state-law exhaustion or pre-permit processes." *Palazzolo*, 533 U.S. at 625-26; *see also id.* at 626 (concluding that, under such facts, "federal ripeness rules do not require the submission of further and futile applications with other agencies").

The Ninth Circuit Court of Appeals has further commented on ripeness and futility as they apply to regulatory takings claims in *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (9th Cir. 1990). That court held that a landowner "must submit one formal development plan and seek a variance from any regulations barring the development proposed in the plan [and] a landowner may need to resubmit modified development proposals that satisfy the local government's objections to the development as initially proposed." *Id.* at 1501. But the Ninth Circuit recognized that further applications would be futile if they required the landowner to apply "through piecemeal litigation or unfair procedures." *Id.* Whether a takings claim is ripe is a question of law reviewed de novo. *MHC Fin. Ltd. v. City of San Rafael*, 714 F.3d 1118, 1130 (9th Cir. 2013).

The City and the amici argue that 180 Land submitted only one development application for the 35-acre site before filing suit and that neither the City's denial of the master plan amendment for the entire 250-acre site, nor its rejection of two other nondevelopment applications, nor the City's other actions constituted a final decision ripening 180 Land's per se regulatory takings claim. 180 Land argues that its per se regulatory takings claim is ripe because it exhausted its administrative remedies or, alternatively, that such efforts would have been futile.[11]

Considering the totality of the City's actions, we conclude that any further attempts to apply for development by 180 Land would have been futile, such that its takings claim was ripe. While the City is correct that 180 Land submitted only one application specifically regarding residential development to the 35 acres, the City's denial of that application failed to provide 180 Land with any basis for the denial that would allow it to "seek a variance" or "satisfy the [City]'s objections to the development as initially proposed." *Del Monte Dunes*, 920 F.2d at 1501. The City merely stated that it was concerned with piecemeal development and there was public opposition to 180 Land's request to develop. Regarding the alleged

---

[11]We reject 180 Land's argument that the ripeness requirement does not apply to per se regulatory takings claims. We have previously held that "courts only consider ripe regulatory takings claims, and 'a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding application of the regulations to the property at issue.'" *Ad Am.*, 131 Nev. at 419, 351 P.3d at 742 (quoting *Williamson Cnty.*, 473 U.S. at 186). As both per se regulatory and *Penn Central* takings claims analyze whether regulations caused a loss of property value, either totally (per se) or nearly totally (*Penn Central*), it follows that the City's decision of how to apply the regulations must be final, or further efforts must be futile, for such claims to be ripe.

concern over piecemeal development, the City had already approved piecemeal development when it approved the development of the 17-acre site. And although the City stated in its denial that it wanted to see a "cohesive plan for the entire area," referring to all of the golf course acreage, the City also denied 180 Land's Master Development application. This latter denial occurred despite City planning staff collaborating with 180 Land on the application for more than two years and recommending that the City approve it. While the Master Development application does not constitute a formal request for a variance, we conclude that it satisfies the mandate that the landowner attempt to comply with the bases for denial by submitting an amended or second development proposal to the requisite governmental agency because it aligned with the City's stated desire for a cohesive development plan regarding all of the golf course acreage.

As to public opposition, the City provided 180 Land with no indication of what request for a variance or modified development application 180 Land could submit in the future that would avoid another denial due to public opposition. The comprehensive Master Development application was started, in part, because 180 Land was told by the City that a Master Development application was the only development request that would be considered due to the public opposition voiced by neighboring property owners. The Master Development application was then denied, and it is unclear from the record what, if any, specific issues were raised by the public opposition that the City concluded warranted denying 180 Land's applications. Without any insight into why the City concluded that the public's opposition was a valid basis to deny 180 Land's development applications, further applications attempting to resolve the unspecified concerns would be futile.

SUPREME COURT
OF
NEVADA

(O) 1947A

Other evidence also supports our conclusion that any further submissions by 180 Land to residentially develop the 35 acres would have been futile because the City showed a general hostility to allowing any development on the site. The City stated it denied 180 Land's basic requests for additional access points and to place fencing around water features because such requests had to be made via a "Major Modification" application under LVMC 19.16.100(G)(1). But that ordinance provides that such an application is only necessary when "through prior action, [the City] has determined that the proposed project or improvement shall be processed as a Major Review; or [it is] determine[d] that the proposed development could significantly impact the land uses on the site or surrounding properties." LVMC 19.16.100(G)(1). It does not appear that access points to vacant land or fences around water features would meet the standards for this more rigorous application process, which requires a pre-application conference, drawings and plans, and notice and a hearing, among other items or actions not required for a minor review under subsection (F). LVMC 19.16.100(G)(2). Indeed, the City's denials did not rely on LVMC 19.16.100(G)(1) but instead stated that it required a "Major Review" because of the pressure from the public debates over the land's development. *See Del Monte Dunes*, 920 F.2d at 1501 (stating that a governmental agency subjecting a landowner to "unfair procedures" supports a finding of futility). The statements of City representatives in relation to 180 Land's attempts to develop the land bolster our futility conclusion. Indeed, the emails and text messages from councilpersons demonstrated a general hostility towards 180 Land's attempts to develop

 

its land.[12]  *See Ad Am.*, 131 at 420, 351 P.3d at 742 (considering the statement of a councilperson when resolving an allegation of futility in a takings case).  Having determined 180 Land's property rights, ascertained the relevant scope of the property at issue, and deemed the takings claim ripe, we now address the district court's conclusion that a taking occurred.

*Per se regulatory taking*

A per se regulatory taking occurs when government regulation "completely deprives an owner of all economical beneficial use of [the] property." *Sisolak*, 122 Nev. at 662, 137 P.3d at 1122; *see also Boulder City v. Cinnamon Hills Assocs.*, 110 Nev. 238, 245-46, 871 P.2d 320, 324-35 (1994) (finding no violation of the Fifth Amendment where the denial of a permit to develop senior citizen housing "did not destroy all viable economic value of the prospective development property").  When resolving this variant of a takings claim, there is no need to "inquir[e] into the public interest advanced in support of the restraint." *Lucas*, 505 U.S. at 1015. That is because "the Fifth Amendment is violated when land-use regulation 'does not substantially advance legitimate state interests *or denies an owner economically viable use of his land.*'"  *Id.* at 1016 (quoting *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980)).  Moreover, when governmental actions deprive an owner of all economically beneficial use of their property, "it is less realistic to indulge [the Court's] usual assumption that the

---

[12]To the extent the City argues that we cannot consider such statements in a futility analysis, we reject that argument.  In *Ad America,* we considered a councilperson's statement that the developer offered as evidence of futility without stating it was improper, instead concluding that the statement from "only one of seven City Council members" was insufficient to demonstrate futility in light of the contrary evidence.  131 at 420, 351 P.3d at 742.

[governmental body] is simply 'adjusting the benefits and burdens of economic life' in a manner that secures an 'average reciprocity of advantage' to everyone concerned." *Id.* at 1017-18 (quoting *Penn Cent.*, 438 U.S. at 124, and *Penn. Coal*, 260 U.S. at 415).

The City's denials of 180 Land's applications and the discussion of those applications at various city council meetings show no meaningful indication that the City would allow any development on the 35 acres. As noted above, the City's denials stated it was rejecting the applications based on strong public opposition and that 180 Land had not provided a cohesive plan for the entire golf course acreage. But the City provided no regulatory basis for the denials[13] that would allow 180 Land to seek a variance or submit an amended application that would resolve any such issues. The City similarly rejected 180 Land's Master Plan application that provided a cohesive plan for the golf course acreage. That these denials occurred despite the City's planning office working with 180 Land on at least one of the proposals and repeatedly recommending that the City approve the applications underscores an unwillingness to allow any development. And the City did not provide 180 Land with any viable alternatives for it to reap economic benefit from the 35 acres when denying its applications. In short, the City's actions demonstrate that it would not approve any development on the 35 acres. Further, we discern no error in the district court adopting 180 Land's expert's opinion that, without the ability to develop the 35 acres,

---

[13]This is especially true considering our conclusion that the PR-OS land designation does not trump the R-PD7 zoning.

it had no economic value.[14] *See Waldman v. Maini*, 124 Nev. 1121, 1129, 195 P.3d 850, 856 (2008) (providing that a court will only disturb factual findings if they are not supported by substantial evidence). We therefore agree with the district court that a taking occurred because the City's actions deprived 180 Land of all of the economic value of the 35 acres at issue in this case.

*Just compensation*

Having determined that a taking occurred, we turn to the just compensation owed for that taking. Before addressing the amount of the award entered by the district court, we address the City's assertions that the district court improperly excluded evidence and used the wrong date of valuation.

*Exclusion of evidence*

The City challenges the district court's exclusion of the PR-OS designation and the $7.5 million purchase contract regarding the acquisition of Fore Stars and its assets from the just compensation trial. Reviewing these decisions for an abuse of discretion, we find none. *See Cox v. Copperfield*, 138 Nev., Adv. Op. 27, 507 P.3d 1216, 1222 (2022) (reviewing the exclusion of evidence for an abuse of discretion). As to evidence regarding the PR-OS designation or any general/master plans showing such a land use designation for the 35 acres at issue, the district court had already concluded, in the first phase of the trial, that R-PD7 zoning trumped the PR-OS designation. As we agree with that conclusion, we necessarily

---

[14]This included evidence that continuing to operate a golf course would result in an economic loss rather than provide economic value.

find no abuse of discretion in the district court's decision to exclude that evidence from the just compensation portion of the trial.

As to the purchase contract, the district court noted that the City failed to provide an expert to contravene 180 Land's expert's opinion that it was irrelevant. The court found that the transaction was for much more than the 35 acres and that the 2005 start date of that transaction was too remote to aid in properly determining the property's value. Moreover, as discussed more in the damages analysis below, just compensation is determined by looking at a property's value at its "highest and best use." Nev. Const. art. 1, § 22(3); *see also Clark County v. Alper*, 100 Nev. 382, 391, 685 P.2d 943, 949 (1984) ("Inverse condemnation proceedings are the constitutional equivalent to eminent domain actions and are governed by the same rules and principles that are applied to formal condemnation proceedings."). As the contract did not identify what portion of the purchase price was attributable to the 35 acres, and because the City failed to show how the purchase price was relevant to determining the 35 acres' value at its highest and best use, we conclude that the district court did not abuse its discretion in excluding this evidence.

*Date of value*

The district court set the "date of value" for the property's valuation as September 14, 2017, the day of the issuance of the first summons in the underlying matter. The court relied on NRS 37.120(1), which addresses eminent domain and provides that "the date of the first service of the summons is the date of valuation," unless the matter is not taken to trial in two years. The City argues that NRS 37.120 only applies in eminent domain actions and that the district court's ruling was otherwise arbitrary because the City denied the application regarding the 35 acres on

June 21, 2017, not September 14. It asserts that the fact that the district court used a different date from which to calculate the property tax and prejudgment interest award (August 2, 2017) further shows the arbitrary nature of using September 14, 2017, as the date of value.[15]

We have previously rejected the argument that NRS 37.120 does not apply in inverse condemnation proceedings. In *Alper*, an inverse condemnation case, we held that NRS 37.120 provided the date of value and rejected the County's argument that the statute was "applicable only to eminent domain proceedings brought by the condemnor under the authority of NRS Chapter 37 and [was] not applicable to inverse condemnation suits." 100 Nev. at 391, 685 P.2d at 949. Deeming no error in the district court's application of NRS 37.120 to find the September 14, 2017, valuation date, we necessarily decline to impose a different date.

*Amount awarded for just compensation*

"The landowner . . . has the burden of establishing the value of the land . . . taken." *City of Las Vegas v. Bustos*, 119 Nev. 360, 362, 75 P.3d 351, 352 (2003). The appropriate value for just compensation "is determined by the property's market value 'by reference to the highest and best use for which the land is available and for which it is plainly adaptable.'" *Id.* (quoting *Alper*, 100 Nev. at 386-87, 685 P.2d at 946). The highest and best use must still, however, "be reasonably probable." *Id.*

Here, 180 Land met its burden by providing an expert to opine on the land's value at its highest and best use. The expert submitted a detailed report that stated a golf course was no longer profitable and that

---

[15]The City does not present an alternative date of value for our consideration.

the highest and best use for the land was residential development, making comparisons to five similar vacant properties sold between 2015 and 2017. The expert report also provided detailed analyses supporting the opinions contained therein, citing relevant literature and attaching exhibits in support. The City presented no contrary evidence, did not depose the expert, and made no attempt to rebut the expert report. Instead, the City noted that, given the district court's rulings on the motions in limine that barred the City from presenting certain evidence, it had "no evidence to admit at the bench trial in rebuttal of [180 Land's expert's] valuation." In light of 180 Land's uncontradicted evidence, we find no error in the district court adopting 180 Land's expert's determination that the value of the 35 acres at its highest and best use was $34,135,000.

*Additional awards of damages*

The City's final arguments challenge the district court's award of property taxes and attorney fees to 180 Land. We also consider 180 Land's challenge to the district court's prejudgment interest award.

*Property taxes*

The district court ordered the City to reimburse 180 Land for its property taxes on the 35 acres starting from the date the court found the City had dispossessed 180 Land of the property, August 2, 2017, totaling $976,889.38.[16] The City argues that the caselaw relied on by the district court does not apply because it involved eminent domain rather than inverse condemnation action. It claims that it did not physically dispossess

---

[16]We reject the City's argument that 180 Land caused the increased taxes by not appealing the assessor's conclusion that the land was residential rather than open space.

SUPREME COURT
OF
NEVADA

(O) 1947A

the property from 180 Land and that the just compensation award already made 180 Land whole.

Our caselaw recognizes that "[a]n owner who is dispossessed from [their] land when it is taken for public use is no longer obligated to pay taxes." *Alper*, 100 Nev. at 395, 685 P.2d at 951. As noted, *Alper* also holds that inverse condemnation and eminent domain proceedings are "constitutional equivalents." *Id.* at 391, 685 P.2d at 949. Thus, the district court did not err in ordering reimbursement to 180 Land for the taxes it paid. And we decline to consider the City's challenge to the date the district court used, as the date was reasonable and the City provides no alternative date for this court to evaluate. *See Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (holding that the court need not consider arguments that a party does not argue cogently or support with relevant authority).

*Attorney fees*

The City next challenges the district court's award of $2,468,751.50 in attorney fees to 180 Land. The district court may only award attorney fees where a statute, rule, or contract allows it, and we review such an award for an abuse of discretion. *Albios v. Horizon Cmtys., Inc.*, 122 Nev. 409, 417, 132 P.3d 1022, 1027-28 (2006). The district court concluded an award was proper under (1) the federal Uniform Relocation Assistance and Real Property Acquisition Act, per NRS 342.105; (2) Article 1, Section 22(4), of the Nevada Constitution; and (3) NRS 18.010(2)(b).

We conclude that an award was proper under NRS 342.105. NRS 342.105(1) makes any "political subdivision of the State" subject to the Relocation Act's regulations, and 49 C.F.R. § 24.107(c) provides:

> The owner of the real property [whose property is taken] shall be reimbursed for any reasonable

> expenses, including reasonable attorney . . . fees, which the owner actually incurred because of a condemnation proceeding, if . . . [t]he court having jurisdiction renders a judgment in favor of the owner in an inverse condemnation proceeding . . . .

And we have already held that the Relocation Act's "plain terms" support such an award when "a property owner . . . was successful in [their] inverse condemnation action."[17] *Sisolak*, 122 Nev. at 675, 137 P.3d at 1130.

The City's final argument is a single sentence that the fee amount was not supported by billing statements and, without such statements, the district court cannot find the fees to be reasonable. But the City fails to cite the record or to salient authority and does not make any further argument; therefore, we need not consider it. *See Edwards*, 122 Nev. at 330 n.38, 130 P.3d at 1288 n.38; NRCP 54(d)(2)(A) (setting out the procedure to seek attorney fees). Based on the foregoing, we will not disturb the district court's attorney fees award.

*Prejudgment interest*

Below, 180 Land requested a prejudgment interest rate of 23-percent per year for the period bookended by the taking and the entry of the prejudgment interest award, approximately 4.5 years. 180 Land based this request on two experts who calculated the rate of return on vacant residential properties in Las Vegas between 2017 and 2021. The district court rejected 180 Land's request and set the prejudgment interest rate at prime plus 2 percent, for a total of $10,258,953.30. We review a district

---

[17]Because we conclude that the award of fees was proper under the Relocation Act, we need not consider whether an award was proper under the Nevada Constitution or NRS 18.010(2)(b).

court's ruling on prejudgment interest for an abuse of discretion. *Sisolak*, 122 Nev. at 675, 137 P.3d at 1130.

The district court did not abuse its discretion in setting the prejudgment interest rate at prime plus 2 percent. "The purpose of awarding interest is to compensate the landowner for the delay in the monetary payment that occurred after the property had been taken." *Alper*, 100 Nev. at 392, 685 P.2d at 950 (citing *Refining Co. v. Dir. of Pub. Works*, 244 A.2d 853, 855 (R.I. 1968)). And "[t]he statutory interest rate establishes at least a *prima facie* basis for determining a fair rate." *Id.* at 394, 685 P.2d at 951. Here, rather than seeking compensation for the delay in payment, 180 Land seeks an interest rate that would reimburse it for the purported profit it lost had it been able to develop the land. This is not the purpose of a prejudgment interest award. *See Interest, Black's Law Dictionary* (11th ed. 2019) (defining "interest" as "[t]he compensation . . . allowed by law for the use or detention of money, or for the loss of money by one who is entitled to its use"). We therefore decline to overturn the district court's prejudgment interest award.

## CONCLUSION

When a governmental agency acts in a manner that removes all the economic value from privately owned land, just compensation must be paid. Here, the City's actions demonstrated a refusal to allow any development on the 35-acre parcel owned by 180 Land such that the parcel no longer had any economic value. The district court therefore did not err in finding that a taking occurred. Nor did the district court err in its just compensation award, as it based that decision on uncontroverted evidence from a duly admitted expert witness. Finally, because we find no error in

the district court's other awards, we affirm the orders appealed in both Docket Nos. 84345 and 84640 in their entirety.[18]

_____, J.
Herndon

We concur:

_____, C.J.
Cadish

_____, J.
Stiglich

_____, J.
Parraguirre

_____, J.
Bell

_____, Sr. J.
Silver

_____, D.J.
Walker

---

[18]Recognizing that the parcels making up the remainder of the golf course acreage are, or may become, the subject of similar litigation, we emphasize that our decision here is based only on the specific facts and circumstances surrounding 180 Land's attempts to develop the 35-acre parcel.